**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SEQUEN AI, INC.,<br><br>Plaintiff,<br>v.<br><br>FETCH REWARDS LLC,<br><br>Defendant. | Case No.<br>[REDACTED VERSION]<br>[redacted]<br><br>**(Jury Trial Demanded)** |

## VERIFIED COMPLAINT

Plaintiff Sequen AI, Inc. ("Sequen"), by and through its attorneys, alleges the following against Defendant Fetch Rewards LLC ("Fetch"):

## NATURE OF THE ACTION

1. Sequen, a revolutionary software company, brings this action to stop its licensee, Fetch, from the ongoing theft and illegal use of Sequen's highly valuable confidential information and trade secrets. In contravention of both the law and its contracts with Sequen, Fetch brazenly pocketed the proprietary data generated from Sequen's trade-secret AI models, systematically logging voluminous outputs from those models and improperly using them in order to train its own internal model to behave like Sequen's, thereby circumventing the expensive and—to ordinary software engineers—otherwise impossible process of successfully teaching an AI model to provide fast, real-time personalization of a user's web experience.

2. Sequen's core product is the Sequen Ranking Platform (the "Platform"), which provides consumer enterprises real-time personalization and ranking infrastructure through first-of-its-kind technology. The Platform is the world's first Behavior Design Engine: a proprietary, integrated infrastructure and artificial intelligence ("AI") system that operates behind a consumer enterprise's website and decides—based on an individual user's actions and a complex network of

AI models, algorithmic logic, and historical data—what content to display to that user. The Platform's architecture is acting continuously and rapidly, so that it can adjust and offer users options that, in sequence, guide that user to the enterprise customer's desired outcome.

3. For consumer enterprises whose bottom-line depends on the success, value, and scale of these business outcomes, Sequen's Platform is nothing short of groundbreaking. Rather than simply feeding consumer behavioral data into an AI model to identify what a consumer might like to see, Sequen's technology produces rankings that induce changes in that behavior, creating value for the consumer enterprise and driving top-line growth.

4. One beneficiary of Sequen's innovation is Defendant Fetch, a company offering a digital-rewards application that allows consumers to earn points and redeem those points for gift cards. Fetch's Chief Executive Officer ("CEO") is Mr. Wes Schroll.

5. Since Fetch began licensing Sequen's Platform and related technology in 2024, Fetch has seen drastic increases in revenue, far surpassing any expectations it had prior to the parties' relationship. In March 2026, a financial media outlet reported that Fetch "saw a 20% lift on net revenue in just under 11 days" with Sequen's services.[1] Fetch's Chief Technology Officer ("CTO") Mr. Ori Schnaps stated to another media outlet that Sequen "helped us unlock a substantial lift in conversions, showing us what's possible when a world-class internal team and the right external partner pull in the same direction."[2] Sequen's other customers have been similarly thrilled with the success of the technology, including its direct impact on revenue.

[1] *Sequen Snags $16M to Bring TikTok-Style Personalization Tech to Any Consumer Company*, TechCrunch (Mar. 18, 2026). https://techcrunch.com/2026/03/18/sequen-snags-16m-to-bring-tiktok-style-personalization-tech-to-any-consumer-company/.

[2] *Sequen Raises $16M Series A to Bring Sub-second In-session Personalization to Enterprise Consumer Companies*, Bus. Wire (Mar. 17, 2026).

6. But Fetch was not content to simply increase the company's bottom-line; it wanted to score wins for its technical team, too. Rather than simply rely on Sequen's models, Fetch devised a plan to move the Platform's functionalities in-house, reducing costs and positioning a Fetch model as a viable internal alternative to Sequen. But there was a problem: Fetch's in-house technical team was incapable of building a model like Sequen's—a fact that became abundantly clear after they tried, and failed, for over a year to build a similar model.

7. After finding it could not build a model as effective as Sequen's, Fetch's internal team decided to take an illegal shortcut: training their own model on Sequen's proprietary data, a step forbidden by the parties' contract and a blatant misappropriation of Sequen's trade secrets. Fetch schemed to collect and log Sequen's proprietary information, including the raw and ranked scores generated by Sequen's Platform, in order to build and train Fetch's internal tool. By building an internal model using Sequen's proprietary information, Fetch could (unlawfully) reap the benefits of Sequen's proprietary information and (falsely) claim an ill-gotten technical victory.

8. Sequen, for its part, worked tirelessly to make its partnership with Fetch a success. After observing Fetch's continued struggles to deliver technical milestones that would allow Fetch to launch Sequen services included in its license, Sequen offered to embed one of its most talented engineers with Fetch to assist with the deployment. That engineer began working in May 2026, at which point he discovered Fetch's misconduct and reported it to Sequen.

9. Fetch engaged in this conduct willfully, wantonly, and maliciously and was fully aware that its actions were wrong and in violation of the parties' agreements and the law. When Sequen's Chief Executive Officer Ms. Zoë Weil confronted Mr. Schroll with Fetch's misconduct,

---

https://www.businesswire.com/news/home/20260317105541/en/Sequen-Raises-%2416M-Series-A-to-Bring-Sub-second-In-session-Personalization-to-Enterprise-Consumer-Companies.

Mr. Schroll acknowledged the evidence made "very clear" that Fetch stole from Sequen. Since that conversation, however, Fetch has refused to take appropriate steps to cleanse itself of Sequen's trade secrets—first ignoring Sequen's direct outreach, and then, through its attorneys, denying any wrongdoing and rejecting Sequen's proposal to undertake formal remediation. As a result, Sequen still does not know the full extent of Fetch's unauthorized use of Sequen's proprietary information and trade secrets.

10. By misappropriating Sequen's proprietary information and trade secrets to illegally retain the highly valuable benefits of Sequen's Platform without compensation, Fetch has and continues to diminish the value of the misappropriated information and trade secrets. On information and belief, Fetch's misappropriation has enabled it to unfairly bypass otherwise expensive and time-consuming efforts required to develop an effective model. Absent relief from this Court, including emergency injunctive relief, Sequen will continue to suffer irreparable harm from Fetch's misappropriation.

11. In addition to causing actual losses to Sequen in the form of unfair competitive harms, Fetch's misconduct has unjustly enriched, and will continue to unjustly enrich, Fetch.

## THE PARTIES

12. Plaintiff Sequen AI, Inc. is a business corporation organized under the laws of the State of Delaware, having its headquarters and principal place of business at 29-22 Northern Boulevard, Long Island City, New York, NY 11101.

13. Defendant Fetch Rewards LLC is a limited liability company organized under the laws of the State of Delaware, with its headquarters located at 1050 East Washington Avenue, Madison, WI 53703.

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because the Complaint asserts a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836. This Court has supplemental jurisdiction over Sequen's state-law claims pursuant to 28 U.S.C. § 1367(a).

15. Jurisdiction and venue are proper in this Court pursuant to a December 15, 2024, Master Services Agreement ("MSA") between Sequen and Fetch, in which they agreed that any disputes relating to the parties' contracts must be brought in Delaware state or federal courts, and that they would submit to the exclusive jurisdiction of the State of Delaware. (*See* Ex. A (MSA § 11(e)).)

16. This Court also has personal jurisdiction over Fetch because Fetch is a resident of the State of Delaware.

17. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

### A. The Modern E-Commerce Industry

18. "E-commerce," or the buying and selling of goods over the Internet, is a multi-trillion-dollar global industry that continues to evolve with technology and consumers' online engagement. In the United States, retail e-commerce sales have more than tripled in just ten years; in 2015, U.S. online retail sales totaled about $338 billion, and in 2025, those sales surpassed $1 trillion.

19. Significant developments in e-commerce technology have fueled the industry's growth, while simultaneously changing consumers' expectations about how content is presented to them online. At the dawn of the industry, online retailers' websites displayed the same content to every customer, in the same order. Later, technology companies experimented with rule-based

customization—a website might present one set of purchase options, in one order, for all webpage visitors from Delaware, and a different set of purchase options, in a different order, for all webpage visitors from California.

20. Large technology companies like Netflix Inc., TikTok Inc., Amazon Inc., and YouTube Inc., upped the ante. With their significant financial resources and troves of user data, these companies invested in in-house engineering teams to build models that analyze user data and adjust what individual users see on their websites, and in what order. By personalizing users' experience, these models drive both engagement and attention. They are the reason TikTok Inc.'s "For You" page and Instagram, Inc.'s discovery feed appear to be uncannily catered to a user's individual taste and preferences—so much so, that users might speculate that their cellphones are reading minds.

21. As users have become accustomed to individually tailored online experiences, their expectations shifted dramatically. Now, consumers expect all online content to anticipate their unique preferences. In 2025, more than 67% of consumers expected their online shopping experiences to be personalized to their individual predilections.

22. Consumers' expectations for personalized experiences are difficult to meet without the financial resources and extensive user-data stores of Netflix Inc., TikTok Inc., Amazon Inc., and YouTube Inc. Due to the prohibitive expense, time, infrastructure demands, and steep competition for engineers, in-house solutions are simply not an option for most companies. Therefore, many companies with significant e-commerce choose to retain third-party vendors to supply customization and ranking architecture. These vendors sell software-as-a-service, or "SaaS," and, for a fee, can connect to a client-company's internal software through Application

Programming Interfaces, or "APIs," providing customization and ranking models not available to the client in house.

23. Traditionally, these third-party vendors provided a ranked list of content (i.e., search results, advertisements, products, etc.) in order of the content's expected relevance to the user, based on historical data ***about that user***—information from user profiles, past clicks, and third-party cookies. By applying standard machine-learning techniques to that accumulated user information, the model could generate "scores" that would "rank" the content. Third-party vendors supplied those rankings to clients, instructing what content to show users.

**B. Sequen's Breakthrough Technology**

24. Founded in 2024, Sequen brought to market an exciting and new way to personalize content and thereby drive business outcomes.

25. Sequen's core product is its Platform. Unlike its predecessors, the Platform's ranking models do not rely on static, private information about a user's past website use, or about who that specific user is. The Platform instead utilizes information about a user's live actions during a web browsing session as a signal of interest, analyzes those actions in light of billions of data points about other users' behavior in similar moments, and offers a sequence of content that is most likely to guide a user to a desired business outcome—whether it be completing a purchase for a specific price, signing up for an account, or interacting with specific content.

26. Powering the Platform are Sequen's proprietary AI models, including Large Event Models ("LEMs"). Sequen's LEMs can be understood through comparison to large language models ("LLMs"), the advanced AI systems trained by ingesting enormous amounts of written material to predict human language. LEMs are similarly trained on human behavior across

websites to predict what a user might do next. Sequen's LEMs are trained on vast amounts of proprietary user-behavior data.

27. Sequen's LEMs are one component of a multi-modal system that includes Sequen IQ and Large Mesh Models ("LMM"). Together, these proprietary technologies employ reinforcement learning, a more dynamic approach than standard machine learning, to determine not just the most relevant choices for a user in a given moment, but the optimal sequence of content to drive the business's desired outcome. Sequen's proprietary ranking models translate these insights into specific, sorted choices for each user.




***Figure 1.*** *A visual representation of the functionality of Sequen's Platform.*[3]

28. These processes are visualized in ***Figure 1***.

29. To access Sequen's rankings, Sequen's customers send an API request to Sequen's Platform, providing a user identifier and list of items to rank. Sequen's models then process two

[3] Sequen AI, Platform, https://www.sequen.ai/platform (last visited June 21, 2026).

categories of "interaction events," such as page views, clicks, and time spent on specific content: (1) the user's real-time interactions on the customer's webpage, and (2) batched/historical events. The AI models, including LEMs and proprietary ranking algorithms, generate predictions, apply reinforcement learning to determine optimal rankings, and return ranked results for display to the user. Each ranking response contains the item identifier for each result and a corresponding "score."

30. These processes are happening fast, and continuously. While a user is in-session, the Platform dynamically re-ranks user experiences in under ***20 milliseconds***. With each new user action, the system recalculates and re-ranks continuously.

31. That Sequen's Platform can accomplish these complex processes, at this pace, is an incredible feat of technology. Behind Sequen's achievements is an elite roster of technical experts with specific experience building search, ranking, and personalization systems in environments with limited user data. As one investor explained, "[n]o other team combines the technical depth and execution velocity"[4] necessary to make Sequen's vision a reality:

a. Zoë Weil, the CEO and co-founder of Sequen, is a distinguished leader and innovator in machine learning and AI. She trained with AI pioneers Yann LeCun and Rob Fergus and developed her expertise working on AI and personalized search and discovery at Etsy. She holds three patents in LLMs and is frequently asked to speak at global events as a thought leader and pioneer in AI.

b. Mo Afshar, a co-founder and member of technical staff, has pioneered research breakthroughs in computer vision and information retrieval. Before Sequen, he lent his scientific expertise to other start-ups including Motion MSK, where he served as Head of Data Science and Engineering, and Risalto Health. He was also an early member of the team at Clarifai, a startup that pioneered breakthrough research in Computer Vision. Clarifai was acquired by Nebius in May 2026.

---

[4] White Star Capital, *Closing the Enterprise Personalisation Gap: Why We Invested in Sequen*, Medium (Mar. 18, 2026), https://whitestarcapital.medium.com/closing-the-enterprise-personalisation-gap-why-we-invested-in-sequen-698accfde582.

c. Marcin Mejran, a co-founder and active advisor to Sequen, entered graduate school at only 12 years old, and trained under Michael Ostrovsky, a pioneer in applying auction theory to real-time advertising. He is currently a Senior Member of Technical Staff at Anthropic.

d. Ethan Benjamin serves as Chief Scientist at Sequen. Prior to joining Sequen, he built and scaled search retrieval and ranking at Etsy, where he and Ms. Weil drove a $1 billion lift in gross merchandise value in a single year.

e. Raphael Louca is the Chief Product Officer at Sequen, joining the company from Meta, where he led a team of 10 research scientists and software engineers in Meta's Monetization Organization and Modeling Foundations Division, focused on advancing personalized retrieval systems. He previously held high-level technical and management roles at Uber and Etsy.

f. [redacted]

**C. Sequen Delivers Extraordinary Results for E-Commerce Clients**

32. In just a short time, the Platform has already driven massive revenue growth for its customers. [redacted]

33. In a very short time, Sequen has seen rapid, validated growth across revenue, profitability, valuation, and technical capability. [redacted]

[redacted]

34. Sequen's valuation stems primarily from its proprietary AI models which, because they are secret, allow Sequen to charge a premium for its services. Sequen undertakes extensive measures to maintain the secrecy of its models, requiring each of its employees to sign NDAs; implementing industry-leading security measures such as requiring multifactor authentication, installing device- and access-management software to provide remote control over employees' hardware; and limiting employee access to trade-secret models on a need-to-know basis. Sequen's customer agreements also expressly forbid its customers from attempting to access or reverse-engineer its models.

**D. Sequen's Master Services Agreement with Fetch**

35. Sequen's first-ever customer agreement was with Defendant Fetch.

36. Fetch, founded around 2013, primarily operates a mobile application and browser extension that let users earn digital rewards. Fetch users can earn points when they shop by scanning or uploading their receipts, shopping online, or playing games on "Fetch Play."

37. A mutual investor introduced Sequen's CEO, Ms. Weil, to Fetch's CEO, Mr. Schroll, in early 2024. At the time, Sequen was searching for strategic relationships to prove the value of its pioneering new product. Fetch, on information and belief, was looking for ways to optimize its technology, drive consumer engagement, and deliver for its customers and investors. Fetch had been on the hunt for personalization technology that would increase revenue but had not successfully delivered a product internally.

38. Sequen and Fetch entered into a Master Services Agreement on December 6, 2024 ("MSA"), which is attached hereto as **Exhibit A.** Under the MSA, Sequen agreed to provide Fetch

with "Services," the specifics of which would be articulated in individual "Service Orders." The MSA gave Fetch a license to access specified Sequen's Services during the term of the agreement (two years), but only for "internal use" by specific authorized users, "as . . . set forth in the applicable Service Order." (Ex. A § 2(a).)[5]

39. Pursuant to the MSA, Fetch agreed "not [to] use the Services for any purposes beyond the scope of the access granted" in the agreement. (Ex. A § 2(c).) The MSA explained that this limitation forbade any attempt to directly or indirectly "copy, modify, or create derivative works of the Services or Documentation, in whole or in part" or to "reverse engineer, disassemble, decompile, decode, adapt, or otherwise attempt to derive or gain access to any software component of the Services, in whole or in part." (*Id.* § 2(c).)

40. Sequen and Fetch also agreed that "use of the Services or Documentation [would] not preclude [Fetch] from independently developing or supporting competing offerings, or working with third parties that offer competitive of [sic] similar Services." (*Id.* § 2(d).) However, the MSA expressly prohibited any "independent development" that would "***result in the infringement of [Sequen's] intellectual property rights, the misappropriation of [Sequen's] trade secrets, or breach of confidentiality obligations hereunder***." (*Id.*) Under the agreement, Sequen's IP included, but was not limited to, "the Services"—as defined in the Service Orders—Documentation, and "any and all intellectual property provided to Customer or any Authorized User in connection with the foregoing and any improvements or modifications thereto." (*Id.* §§ 1(e), 6(a).)

[5] The MSA also gave Fetch a license to use Sequen's Documentation in connection the use of the Services. (Ex. A § 2(b).)

41. The parties further agreed that Fetch would keep secret Sequen's confidential information, which is defined to include "information about its business affairs, products, confidential intellectual property, trade-secrets . . . and other sensitive or proprietary information in written or electronic form or media, . . . whether or not marked, designated, or otherwise identified as 'confidential.'" (*Id.* § 5.) Fetch agreed to limit distribution of Sequen's confidential information to those of its employees who "have a need to know" to allow Fetch "to exercise [that party's] rights or perform its obligations" under the agreement. (*Id.*)

42. On December 15, 2024, nine days after entering the MSA, the parties signed their first Service Order ("Service Order #1") for a two-year term, attached hereto as **Exhibit B**. Service Order #1 defined the scope of Services as follows:

> [A] ranking and retrieval service that enables results for each individual Customer user, available via API, designed or customized to operate with Customer's environment and subject to configuration or modification at Customer's request, with the following enabled characteristics: Personalized Search, Personalized Recommendations, and Conversational Discovery.

(Ex. B § 1(a).)

43. In exchange for these Services, Fetch agreed to pay a license fee of [redacted] and a minimum monthly infrastructure fee ("Minimum Infra Fee") of [redacted] for up to [redacted] requests per second ("RPS"). (*See* Ex. B §§ 2(a), 2(b)(i).) Under these terms, the minimum yearly payment was [redacted]. [redacted]."[6] [redacted]

[6] [redacted]

**E. Sequen's Trade-Secret Model Delivers Results Fetch Could Not Achieve Alone**

44. After executing Service Order #1, the teams at Fetch and Sequen began their work together on an initial use case: personalized offer ranking within Fetch's application, or the [redacted] model. From the outset, operational failures on Fetch's side slowed and complicated the process. [redacted] Sequen's technology promised to be a solution.

45. To test the [redacted] model, Fetch and Sequen conducted a series of live experiments, or A/B tests, to measure Sequen's performance. The goal of these experiments was to compare Fetch users who received Sequen-powered, personalized offers against a control group (which, unbeknownst to Sequen until later, was actually Fetch's own in-house ranking technology). Sequen's models require continuous, timely, and accurate data from Fetch to learn how users interact with offers. Any interruption to that data feed—caused, for example, by Fetch's systems breaking down—renders the data unreliable and undermines experiment results.

46. Sequen's models delivered consistent wins against Fetch's own internal models. [redacted]

47. During the third experiment, Sequen learned that Fetch had been using its in-house model to "compete" with Sequen's models throughout these experiments—meaning the control group was Fetch's own technology. [redacted] Sequen had no reason to believe that the proprietary outputs of Sequen's models would instead be used to improve or train Fetch's competing system.

48. As the experiments continued, Fetch's technical errors continued to mount. In the fourth experiment (August 2025), [redacted] The fifth experiment (September 2025), [redacted], proved even more frustrating. By mid-September, [redacted] On information and belief, Fetch ended the experiment because its own internal models were performing poorly compared to Sequen's.

49. Because of Fetch's consistent technical errors during the live experiments, Sequen inferred that Fetch's engineers lacked the technical know-how to run successful experiments. Sequen's CEO, Ms. Weil, believed these failures were delaying Fetch from recognizing that it should abandon its efforts to develop an internal model and instead expand its relationship with Sequen. Yet, Sequen continued to move forward because Ms. Weil believed that Fetch's rewards and discount products were promising given the economic environment, and that Sequen's

technology was particularly well-suited to improving those products. She hoped that Fetch and Sequen would, together, achieve technical and financial success.

50. [redacted] Prior to its relationship with Sequen, [redacted] But Sequen's technology had done what Fetch, on its own, could not: achieve rapid, sustained lift.

**F. Fetch Expands Its Relationship with Sequen**

51. In light of Sequen's success, the parties decided to expand their relationship. In early 2026, Mr. Schnaps reached out on behalf of Fetch's executives, relaying their desire to work with Sequen on Fetch's largest opportunities and accelerate annual growth. Mr. Schnaps proposed discussing a "working model" and potentially updating the contract.

52. On or about March 27, 2026, Fetch and Sequen entered into "Service Order #2", attached hereto as **Exhibit C,** effective April 1, 2026, expanding Sequen's services. Under that agreement, Sequen agreed to provide Fetch with frontier re-ranking model sets for six business use cases within Fetch's application, as well as a license to Sequen's proprietary "RankTune" model-configuration platform. In exchange, Fetch's annual license fees increased to [redacted]

53. The expansion of services only intensified issues with Fetch's in-house engineering team. By April 2026, it was evident that Fetch's internal team was slowing efforts to scale projects.

Task lists revealed Fetch's team was not timely completing assigned work. In mid-to-late April, [redacted]

54. In May 2026, [redacted] Sequen also learned that Fetch, despite contracting for three different products, could not support data needs for the new models.

55. Sequen was frustrated by the slow progress. But Ms. Weil still believed that Fetch could provide a powerful example of what the Platform team could deliver, and her belief was sustained by the mutual investor Sequen and Fetch shared. In an attempt to de-bottleneck their shared work and expedite the deployment of Sequen's models, Sequen proposed that its Chief Product Officer, Mr. Raphael Louca, temporarily work directly with Fetch, as a Sequen employee within Fetch's systems. Mr. Louca is a highly accomplished AI engineer, and Sequen hoped his technical expertise would fill important gaps within Fetch's in-house team and allow Fetch to deploy Sequen's models error-free.

56. Accordingly, Fetch and Sequen amended the MSA to authorize Sequen to "embed" Mr. Louca at Fetch temporarily. (*See* Ex. D.) Under the terms of that amendment, Mr. Louca remained employed by Sequen. With Mr. Louca in place, Sequen's team was optimistic that the parties would experience fewer operational failures, greater technical efficiency, and increased revenue for Fetch.

**G. Sequen Discovers Fetch's Theft of Sequen's Highly Valuable Trade Secret, Confidential, and Proprietary Information**

57. At the end of May 2026, Fetch sent Mr. Louca a Fetch laptop and Slack credentials, which gave him unrestricted access to Fetch's Slack channels.[7] Between June 1 and 2, 2026, unable to log on to his Fetch laptop, Mr. Louca signed into Slack on his Sequen-issued laptop to fulfill his onboarding requirements, join Fetch's information technology ("IT") channel, and obtain access to the laptop.

58. Because his work at Fetch involved Sequen's models, Mr. Louca searched Fetch's Slack application for the term "Sequen," hoping to identify channels pertinent to his work. Mr. Louca was uncomfortable with the results: [redacted]

59. In the ordinary course of business, Sequen's model outputs are inherently ephemeral; they exist only during live operation and are then deleted, which ordinarily protects them from capture. Fetch's documentation reveals that, [redacted]

60. By capturing Sequen's high-quality outputs, Fetch could run hundreds of "offline" tests to rapidly improve its own model—accomplishing in hours or days what would have taken years through legitimate online testing. In machine-learning development, running a competing

[7] Slack Technologies LLC offers a business communication platform that enables companies to organize team conversations into channels, share files, and integrate with other workplace tools. Many companies, Fetch included, use Slack for correspondence that might once have occurred via email. (*See* https://slack.com/ (last visited June 22, 2026).)

model against high-quality labeled outputs, like Sequen's scores, allows engineers to identify systematic gaps between their model's predictions and the benchmark, adjust feature weights, model architecture, and hyperparameters based on those gaps, and iterate rapidly without the cost or time required for live A/B testing. In short, Fetch sought to bootstrap its way to a competitive model by piggybacking on Sequen's superior engineering in violation of the MSA.

61. Fetch's Slack messages leave no doubt about Fetch's intent. [redacted]

62. Over the following days, Fetch's engineers laid out their plan in detail. [redacted] This was brazen theft of Sequen's trade secrets and a clear breach of MSA §§ 2(a)-(d) & 5.

63. Upon further investigation, Mr. Louca discovered that [redacted] (*See* Ex. E (document containing Mr. Louca's screenshots).)

## H. Fetch's Conduct Violated the MSA and Misappropriated Trade Secrets

64. By systematically capturing, logging, and analyzing Sequen's proprietary outputs, Fetch misappropriated the ***knowledge*** embedded in Sequen's AI models—the very thing that makes them so effective at driving revenue lift, and the crux of their economic value.

65. The secrecy of Sequen's models and outputs contributes to their value, and to the value of Sequen's Platform, because they can be used to derive the secret knowledge of consumer behavior embodied in Sequen's models. That knowledge is secret, protected, and closely guarded. Only licensees like Fetch may access Sequen's outputs for use with its contracted-for services, and those licenses are narrow in scope, with multiple provisions protecting Sequen's confidential information and trade secrets, including both the outputs and the underlying models themselves. (*See infra* Section D.)

66. The MSA and Service Orders limited Fetch's access to Sequen's Platform to specific, enumerated services:

| Service Order #1 (Dec. 15, 2024) | Service Order #2 (April 1, 2026) |
|---|---|
| "[A] ranking and retrieval service that enables results for each individual Customer user, . . . designed or customized to operate with Customer's environment and subject to configuration or modification at Customer's request, with the following enabled characteristics: Personalized Search, Personalized Recommendations, and Conversational Discovery." (Ex. B § 1(a) ("For You" Model).) | Sequen Ranking Platform License, which included models for six business use cases: (1) [redacted] (2) "For You" AI Model, defined consistent with Service Order #1; (3) an AI re-ranking model [redacted]; (4) three additional AI re-ranking models for to-be-determined business use cases; and RankTune. (Ex. C at 2.) |

67. The MSA explicitly prohibited use beyond those enumerated services. Fetch agreed not to "use the Services for any purposes beyond the scope of the access granted," including "copy[ing], modify[ing], or creat[ing] derivative works of the Services" or "reverse engineer[ing],

disassembl[ing], decompil[ing], decod[ing], adapt[ing], or otherwise attempt[ing] to derive or gain access to any software component of the Services." (Ex. A § 2(c).)

68. The MSA also barred Fetch from using Sequen's outputs to develop competing models. While Fetch could "continue work developing similar Services," it could do so only "provided such activities do not result in the infringement of Provider's intellectual property rights, the misappropriation of Provider's trade secrets, or breach of confidentiality obligations." (*Id.* § 2(d).) And those confidentiality obligations permitted sharing information only with employees who "have a need to know" in order to ***"exercise its rights or perform its obligations hereunder"***—not to build a rival product. (*Id.* § 5.)

## I. Schroll Acknowledges Fetch's Theft

69. On June 1, 2026, Mr. Louca informed Sequen's CEO, Ms. Weil, of Fetch's theft. Ms. Weil immediately reached out to the investor who had introduced her to Mr. Schroll, who urged her to resolve the matter privately rather than involve attorneys. (Declaration of Z. Weil filed in support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction ("Weil Decl.") ¶ 42.)

70. On June 2, Ms. Weil, Mr. Schroll, and the investor held a call. Mr. Schroll acknowledged the threat of litigation and his company's preservation obligations, and Mr. Schroll claimed he needed to "investigate" what had happened concerning Fetch's willful, wanton, and knowing theft of Sequen's trade secrets. Ms. Weil demanded that Mr. Schroll terminate Fetch's CTO, Mr. Schnaps. Mr. Schroll balked, and Ms. Weil hung up. (*Id.* ¶ 43.)

71. The investor reconvened the call thereafter. Mr. Schroll again professed ignorance and claimed he could not fire Mr. Schnaps without being subject to litigation related to the potential termination. Mr. Schroll promised Ms. Weil that he would get to the bottom of what had

transpired. Suspending disbelief that Mr. Schroll somehow did not know about the extensive, ongoing plan to misappropriate Sequen's trade secrets, and giving Mr. Schroll every benefit of the doubt, Ms. Weil offered to share her screen and present to Mr. Schroll the evidence demonstrating Fetch's extensive and ongoing plan to misappropriate Sequen's trade secrets. Ms. Weil did so, explaining the documents in layman's terms. (Weil Decl. ¶¶ 43-44; *see also* Ex. E.)

72. When Ms. Weil finished, she candidly inquired: "So can we agree that your team stole from my company?" Mr. Schroll hesitated. The investor reminded him the call was not being recorded. Ms. Weil repeated the question at least once. Mr. Schroll's response was unequivocal: ***"Yes, that much is very, very clear."*** (*Id.* ¶ 44 (emphasis added).)

73. Ms. Weil then asked whether Mr. Schroll wanted Sequen to terminate Fetch's access to Sequen's licensed services while he investigated the matter. Mr. Schroll said it was her call. Ms. Weil chose to leave the models running because she did not want Fetch to lose profits and opportunities for profits if Mr. Schroll truly intended to make things right. (*Id.* ¶ 45.)

74. At the end of the call, Mr. Schroll asked Ms. Weil to transmit the evidence to him. Ms. Weil did so, promising to annotate it so Mr. Schroll could easily follow along. Mr. Schroll thanked Ms. Weil. (*Id.*)

75. The next day, June 3, Ms. Weil sent Mr. Schroll a text message: "FYI, as violated as I feel because of this theft, I genuinely feel for you. Im [sic] here for you, I will help you get to the bottom of this in a way that is super clear and intuitive for you." That evening, Ms. Weil sent Mr. Schroll a marked-up Google document outlining the issues with annotated screenshots. Ms. Weil further texted: "You, [the investor], and Raphael [Louca] are the only ones that have seen this. I want to help you root this out." (*Id.* ¶¶ 46-47.)

76. Mr. Schroll never responded to Ms. Weil.

77. The next day, June 4, Ms. Weil texted again: "Hey Wes. Where are we?? I put a LOT of trust in you after what happened to try and mediate this privately, but Im [sic] really losing patience. This shouldnt [sic] take so long. It's a crazy slam dunk, water is wet situation. What's the hold up?" (*Id.* ¶ 48.)

78. Again, Mr. Schroll never responded to Ms. Weil.

**J. Fetch Refused and Refuses to Remediate Its Trade Secret Misappropriation**

79. Mr. Schroll's silence left Sequen with no choice but to seek legal redress and file this civil action against Fetch. On June 5, 2026, prior to filing this civil action, Sequen's counsel sent Fetch a cease and desist letter demanding that Fetch implement a legal hold regarding the issues included in this Verified Complaint and (a) immediately halt all development, testing, and deployment of any ranking model or other technology informed by Sequen's services, confidential information, intellectual property, or trade secrets; (b) immediately sequester and cease all use of Sequen's confidential information and trade secrets while preserving them for litigation; (c) identify all Fetch employees who accessed or used Sequen's confidential information; (d) provide a complete accounting of how Sequen's information was used; and (e) submit to an independent forensic audit conducted by a mutually agreed-upon third-party examiner. (*See* Declaration of K. Bi filed in support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction ("Bi Decl.") Ex. 1.)

80. On June 10, 2026, Fetch's counsel responded to the undersigned, denying any wrongdoing. (Bi Decl. Ex. 2.) Fetch claimed it "neither trained on nor built any model using Sequen's scores or rankings" and that "[t]he only activity Fetch undertook in connection with Sequen's outputs was industry-standard benchmarking." (*Id.*) Counsel for Fetch's letter elaborated that the internal documents—which referenced the ability to "rank, replay, train,

segment, and design controlled exploration" around Sequen's scores— "describe[] using Sequen's outputs to measure Sequen, not to learn from it." (*Id.*) Fetch dismissed Sequen's remediation demands as "meritless and disproportionate" and proposed instead that the parties simply delete each other's data, sign a mutual non-disparagement agreement, and "go their separate ways." (*Id.*)

81. Sequen knew Fetch's explanation was inconsistent with its documents. Those documents described [redacted] (Ex. E at 9 (emphasis added).) [redacted] (*Id.* at 2.) They have no application to "measuring" Sequen's service. The term [redacted] has a specific, well-understood meaning in machine learning: using data to improve a model's performance. [redacted] Similarly, [redacted] refers to re-running historical data through a model to evaluate and refine its predictions—another core model-development activity. And [redacted] describes a method of systematically testing model variations to identify optimal configurations. All of these techniques have the same goal: to extract valuable and previously secret information from the underlying data. Measuring Sequen's service required only observing Sequen's demonstrated lift in live experiments, not logging its model outputs, preserving them in Snowflake, or designing "controlled exploration" around them. Indeed, Fetch's conduct and communications demonstrate that it had been completing, or planning to complete, online experimentation throughout the parties' relationship to measure Sequen's effectiveness, so there was no need for secret offline testing—unless Fetch intended to use Sequen's data for its own model development.

82. Accordingly, on June 11, 2026, Sequen's counsel responded, rejecting Fetch's proposed resolution. Counsel for Sequen explained to counsel for Fetch that, contrary to Fetch's characterization, the internal documents Fetch quoted indicated that "Fetch is discussing training of its own model with Sequen's scores." (Bi Decl. Ex. 3.) Sequen requested a meet and confer to discuss the matter. (*Id.*)

83. The parties' counsel held a telephone call on June 12, 2026. (Bi Decl. ¶ 5.) During that call, Fetch's counsel stated that Fetch did not understand why remediation was necessary and that Fetch would be willing to provide a certification that it had not engaged in wrongdoing. Sequen's counsel explained that a certification from Fetch was not sufficient—particularly given Mr. Schroll's prior acknowledgment to Sequen's CEO, Ms. Weil, that Fetch's internal documents "clear[ly]" reflect theft. Fetch's counsel expressed uncertainty about how remediation would work. (*Id.*)

84. On June 15, 2026, Fetch's counsel sent an email stating only that Fetch was "still conferring with our client and will be in touch again soon." (Bi Decl. ¶ 6.)

85. On June 17, 2026, to expedite discussions and address Fetch's expressed uncertainty about the remediation process, Sequen's counsel outlined specific steps that a third-party forensic consultant would undertake under the circumstances. (Bi Decl. Ex. 4.) These steps included and include: (1) ensuring that Fetch had implemented a legal hold covering all machine learning models, training metadata, training datasets, source code, scripts, logs, communications, infrastructure configurations, and all backups and version histories, from the inception of the Sequen engagement through the present, with all automated deletion and rotation policies suspended; (2) conducting a forensic collection of all relevant data sources and cataloguing their chain of custody in accordance with industry forensic standards, with analysis to identify the

presence of Sequen's data and system outputs within Fetch's systems, including Fetch's training datasets, ranking models, and internal development history; and (3) remediating all affected systems by removing Sequen's data from every location, including training datasets, active systems, and backup systems, and reverting any affected models to a verified version predating their training on, combination with, or other incorporation of or reliance on Sequen's data. (*Id.*) Sequen indicated that it had retained a consultant prepared to complete these steps and was also open to retaining a neutral consultant, provided one was identified without delay. (*Id.*) Sequen requested Fetch's position on Sequen's proposal by June 18, 2026. (*Id.*)

86. On June 18, 2026, Fetch's counsel responded via email—and changed Fetch's story for the second time. (Bi Decl. Ex. 5.) In its June 10 letter, Fetch had claimed its engineers were "using Sequen's outputs to measure Sequen, not to learn from it." (Bi Decl. Ex. 2.) Fetch now admitted the truth: Sequen's outputs had been used "to benchmark Fetch's independently developed models against Sequen's outputs." (Bi Decl. Ex. 5.) In other words, on June 10, Fetch claimed it was using Sequen's data to evaluate ***Sequen***. On June 18, it admitted the truth: it was using Sequen's data to improve ***Fetch***.

87. Fetch's June 18 email attempted to minimize the scope of its misconduct. Fetch claimed the "benchmarking exercise . . . just recently occurred" and involved "just 2 weeks of Sequen's scores." (*Id.*) But that characterization obscures the scale of what Fetch captured. Two weeks of Sequen's data amounts to billions of data points—on average, nearly [redacted] That volume is sufficient to run thousands of offline tests: replaying Fetch's models against Sequen's outputs, observing the differences, identifying where Fetch's model was failing, and determining what changes to model architecture, feature selection, feature weighting, and output logic could improve performance. These offline tests also permit Fetch to circumvent the time-

consuming online A/B testing process, which requires weeks or months to complete a single experiment, and conduct thousands of tests in hours or days, saving Fetch years of expensive, burdensome research and development.

88. Moreover, the intelligence extracted from this "benchmarking" process cannot be "deleted." Once Fetch's engineers analyzed the gaps between Fetch's model and Sequen's outputs, they learned which features mattered, which weights needed adjustment, and which architectural choices produced better results. Those learnings would remain in the engineers' minds indefinitely, available to inform Fetch's development regardless of whether the underlying data was later deleted. Simply put, Fetch's engineers extracted the competitive intelligence embedded in Sequen's trade-secret models and cannot now unlearn it.

89. Fetch's conduct flagrantly violated the MSA—and Fetch did not even attempt to argue otherwise. The MSA prohibited and prohibits Fetch from using Sequen's services "for any purposes beyond the scope of the access granted," which was limited to a ranking and retrieval service for Fetch's application. (Ex. A § 2(c).) The MSA also prohibited Fetch from "copy[ing], modify[ing], or creat[ing] derivative works of the Services" and from "reverse engineer[ing], disassembl[ing], decompil[ing], decod[ing], adapt[ing], or otherwise attempt[ing] to derive or gain access to any software component of the Services." (*Id.*) Using Sequen's proprietary outputs to evaluate Fetch's competing models—and thereby deriving competitive intelligence about relative model performance—falls squarely within those prohibitions. (*See, e.g.*, *id.*; Ex. A § 2(d).)

90. Finally, Fetch's June 18 email disclosed that Fetch had already deleted the logged data, before any independent verification could occur. (Bi Decl. Ex. 5.) The email offered only "a written certification from a duly authorized company representative—under penalty of

perjury—confirming that all Sequen data has been permanently deleted from Fetch's systems." (*Id.*) Fetch again refused to engage a third-party forensic consultant. (*Id.*)

91. Fetch's proposed certification did not address several aspects of the remediation Sequen requested. A certification of data deletion does not provide for independent verification, identification of Sequen data within Fetch's systems, analysis of whether Sequen data was incorporated into Fetch's models, or reversion of affected models to pre-contaminated versions. Critically, Fetch's certification does not address whether Fetch's models were updated or otherwise modified based on the benchmarking exercise or containment of knowledge acquired from the benchmarking exercise.

92. In any case, Sequen cannot rely upon Fetch's certification for all of the reasons stated herein. On June 2, Mr. Schroll looked at the evidence and told Sequen's CEO, Ms. Weil, it was "very, very clear" that Fetch had "stolen" from Sequen. (Weil Decl. ¶ 44.) Days later, Fetch's counsel denied any wrongdoing. (Bi Decl. Ex. 2.) Fetch's internal documents describe [redacted] on Sequen's data; Fetch now claims no training occurred. (*Id.*) On June 10, Fetch said its engineers were using Sequen's outputs "to measure Sequen" (*id.*); on June 18, Fetch admitted they were using Sequen's outputs "to benchmark Fetch's independently developed models" (Bi Decl. Ex. 5). Fetch claims the exercise "just recently occurred" and involved "just 2 weeks" of data (*id.*), yet the Slack messages from May 15 [redacted]—meaning Fetch had logged Sequen's data before (Ex. E at 9). And before Sequen could verify any of this, Fetch deleted the evidence. (Bi Decl. Ex. 5.) No self-certification from Fetch could reliably protect Sequen's trade secrets and provide Sequen with a remedy at law. Accordingly, Fetch has forced Sequen to seek equitable relief by way of this Verified Complaint and accompanying Motion for Temporary Restraining Order and Preliminary Injunction.

### K. Sequen Will Suffer Substantial and Irreparable Harm as a Result of Fetch's Misconduct

93. Absent immediate, emergency, preliminary, and permanent injunctive relief from this Court in the form of a temporary restraining order, preliminary injunction, and permanent injunction, Sequen will continue to suffer irreparable harm for which there is no adequate monetary damages award.

94. If Defendant is permitted to develop and use models using Sequen data or knowledge derived from running experiments with Sequen data without intervention, the value of Sequen's trade-secret models and data—the core of its business model and its revenue generator—will be significantly degraded. Sequen will have effectively lost control over its unique, proprietary, and previously secret innovation. The effects will also not be limited to this case; an entire AI industry that depends on enforcement of licensing agreements will face the degradation of their highly valuable trade secrets, in a highly competitive market where innovation depends on secrecy.

95. Defendant has acknowledged as much in the contract that formed the basis of their relationship with Sequen. In the MSA, Fetch acknowledged that the misuse of confidential information "would cause the other Party irreparable harm for which monetary damages would not be an adequate remedy," and agreed that, "the other Party will be entitled to seek equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy." (Ex. A § 11(j).)

**COUNT I**
*Misappropriation of Trade Secrets*
*Under the Defend Trade Secrets Act ("DTSA")*
(18 U.S.C. § 1836, *et seq.*)

96. Paragraphs 1 through 96 of this Complaint are hereby repeated and realleged as if fully set forth herein.

97. Fetch has committed actual or threatened trade secret misappropriation in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

98. Sequen is the owner of its confidential information, which includes trade secrets relating to its proprietary models and Services offered to Fetch pursuant to the MSA. These trade secrets and confidential information derive independent economic value from not being known to the public or other persons who could obtain economic value from their disclosure or use. Sequen's services are used in, or intended for use in, interstate and/or foreign commerce.

99. Sequen takes reasonable steps under the circumstances to keep its confidential information and trade secrets, secret, including through several provisions embedded in the MSA governing confidentiality and limiting Fetch's use and access. (Ex. A §§ 1(e), 2, 5, 6(a).) Fetch misappropriated its confidential information and trade secrets by wrongfully obtaining, logging, and/or using it to develop a competitive model to Sequen's. Sequen's investigation of this conduct, which is ongoing, has identified repeated admissions of misappropriation by Fetch, including those described above.

100. Fetch knows or should know that Sequen's confidential information and trade secrets were misappropriated. As discussed above, Fetch was permitted to access Sequen's confidential information and trade secrets pursuant only to a limited license and was prohibited from creating its own model relying in any way upon Sequen's confidential information and trade secret or disclosing them in violation of the limitations in the contract.

101. Fetch has caused and continues to cause Sequen damage and irreparable injury.

102. Sequen is entitled to an award of damages available under 18 U.S.C. § 1836 for Fetch's unjust enrichment and trade secret misappropriation.

103. Fetch's misappropriation is reckless, willful, wanton, and malicious and thereby entitles Sequen to an award of exemplary damages as well as attorneys' fees.

104. Fetch's misappropriation of Sequen's confidential and trade secret information has caused and will continue to cause Sequen irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting Fetch from misappropriating, using or disclosing Sequen's confidential and trade secret information in any manner, and ordering that Fetch permanently destroy any of Sequen's confidential and trade secret information in its possession, custody or control, including any materials that in any way are derived from, used, or relied on that information, is necessary to provide Sequen with complete relief.

## COUNT II

*Breach of Contract Under Delaware Law*

105. Paragraphs 1 through 104 of this Complaint are hereby repeated and realleged as if fully set forth herein.

106. The MSA and the incorporated Service Orders constitute valid and enforceable contracts. *See* Exs. A, B, C.

107. Fetch has breached the contractual provisions to which it agreed. Fetch has used and continues to use Sequen's confidential and trade secret information in a manner inconsistent with the express terms of the MSA, including by relying on the confidential and trade secret information to develop a competing model to Sequen's.

108. Sequen is entitled to an award of damages based on Fetch's breach of contract.

109. Fetch's breach has caused and continues to cause irreparable harm to Sequen, not all of which is readily calculable and therefore cannot be fully redressed through money damages alone. An injunction prohibiting Fetch from misappropriating, using, or disclosing Sequen's confidential and trade secret information in any manner, and ordering that Fetch permanently destroy any of Sequen's confidential and trade secret information in their possession, custody, or control, including any materials that in any way are derived from, used, or relied on that information, is necessary to provide Sequen with complete relief.

**COUNT III**
*Misappropriation of Trade Secrets*
*Under the Delaware Uniform Trade Secrets Act ("DUTSA")*
(6 Del. § 2001, *et seq.*)

110. Paragraphs 1 through 109 of this Complaint are hereby repeated and realleged as if fully set forth herein.

111. Fetch has committed actual or threatened trade secret misappropriation in violation of the Delaware Uniform Trade Secrets Act ("DUTSA"), 6 Del. § 2001, *et seq.*

112. Sequen is the owner of its confidential information, which includes trade secrets relating to its proprietary models and Services offered to Fetch pursuant to the MSA. These trade secrets and confidential information derive independent economic value from not being known to the public or other persons who could obtain economic value from their disclosure or use.

113. Sequen takes reasonable steps under the circumstances to keep its confidential information and trade secrets, secret, including through several provisions embedded in the MSA governing confidentiality and limiting Fetch's use and access. (Ex. A §§ 1(e), 2, 5, 6(a).) Fetch misappropriated its confidential information and trade secrets by wrongfully obtaining, logging, and/or using them to develop a competitive model to Sequen's. Sequen's investigation of this

conduct, which is ongoing, has identified repeated admissions of misappropriation by Fetch, including those described above.

114. Fetch knows or should know that Sequen's confidential information and trade secrets were misappropriated. As discussed above, Fetch was permitted to access Sequen's confidential information and trade secrets pursuant only to a limited license and was prohibited from creating its own model relying in any way upon Sequen's confidential information and trade secrets or disclosing them in violation of the limitations in the contract.

115. Fetch has caused and continues to cause Sequen damage and irreparable injury.

116. Sequen is entitled to an award of damages available under 6 *Del. C.* § 2001 for Fetch's unjust enrichment and trade secret misappropriation.

117. Fetch's misappropriation is reckless, willful and malicious and thereby entitles Sequen to an award of exemplary damages as well as attorneys' fees.

118. Fetch's misappropriation of Sequen's confidential and trade secret information has caused and will continue to cause Sequen irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting Fetch from misappropriating, using or disclosing Sequen's confidential and trade secret information in any manner, and ordering that Fetch permanently destroy any of Sequen's confidential and trade secret information in its possession, custody, or control, including any materials that in any way are derived from, used, or relied on that information, is necessary to provide Sequen with complete relief.

## COUNT IV
*Unjust Enrichment*

119. Paragraphs 1 through 118 of this Complaint are hereby repeated and realleged as if fully set forth herein.

120. Sequen provided Fetch with numerous tangible benefits during its partnership with Fetch, including without limitation, confidential and trade secret information to Fetch that, on information and belief, and for the reasons stated herein, Fetch used, planned to use, or learned from, in order to develop its own competing product.

121. Sequen has been impoverished by conferring these benefits on Fetch. Among other injuries, the value of Sequen's company, product, and proprietary technology has been diminished due to Fetch's reckless, willful, wanton, and malicious conduct. In turn, Fetch gained valuable trade secrets without paying for them, thereby saving substantial development time and costs.

122. It would be inequitable for Fetch to retain the benefits that Sequen conferred onto it.

## **PRAYER FOR RELIEF**

WHEREFORE, Sequen demands judgment against Defendant Fetch as follows:

1. Preliminarily and permanently enjoin Fetch, and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from further misappropriating and using Sequen's trade secrets under the Defense of Trade Secrets Act (18 U.S.C. § 1832 *et seq*.).

2. Award Sequen damages in an amount sufficient to compensate it for Fetch's unfair and deceptive trade practices under 18 U.S.C. § 1836(b).

3. Preliminarily and permanently enjoin Fetch, and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from further misappropriating and using Sequen's trade secrets under the Delaware Uniform Trade Secrets Act (6 *Del. C.* § 2001, *et seq*.).

4. Award Sequen damages in an amount sufficient to compensate it for Fetch's further unfair and deceptive trade practices under the Delaware Uniform Trade Secrets Act (6 *Del. C.* 2003, *et seq.*).

5. Award Sequen all compensatory damages in a sum certain or amount to be determined at trial for Fetch's breach of contract.

6. Award Sequen all compensatory damages in a sum certain or amount to be determined at trial for Fetch's unjust enrichment.

7. Award Sequen all actual, compensatory, consequential, exemplary, liquidated, treble, and special damages to which it is entitled in an amount to be determined at trial;

8. Assess punitive damages against Sequen;

9. Award Sequen all attorneys' fees and costs to which it is entitled associated with bringing and prosecuting this action;

10. Award pre-judgment and post-judgment interest against Fetch; and

11. Award Sequen such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Sequen hereby demands a trial by jury on all issues triable before a jury in this action.

Dated: June 22, 2026

*/s/ Ronald P. Golden III*
Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE 19801
Telephone: 302.429.4238
Facsimile: 302.658.6395
Email: sbrauerman@bayardlaw.com
Email: rgolden@bayardlaw.com

Kathryn Bi (*pro hac vice* forthcoming)
Margaret M. O'Neil (*pro hac vice* forthcoming)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone: 212.336.2000
Facsimile: 212.336.2222
Email: kbi@pbwt.com
Email: moneil@pbwt.com

*Attorneys for Plaintiff Sequen AI, Inc.*

# EXHIBIT A

# Master Service Agreement

This Master Service Agreement (this "**Agreement**"), effective as of December 15, 2024 (the "**Effective Date**"), is by and between Faber Labs, Inc., a Delaware corporation with an address at 800 North State Street Suite 304, Dover, DE 19901 ("**Provider**"), and Fetch Rewards, LLC, a Delaware limited liability company with offices located at 1050 E. Washington, Madison, Wisconsin 53703 ("**Customer**"). Provider and Customer may be referred to herein collectively as the "**Parties**" or individually as a "**Party**."

1. <u>Definitions</u>.

(a) "**Authorized Users**" means Customer's employees, consultants, contractors, and agents who are authorized by Customer to access and use the Services under the rights granted to Customer pursuant to this Agreement.

(b) "**Customer Data**" means information, data, and other content, in any form or medium, that is submitted, posted, or otherwise transmitted by or on behalf of Customer or an Authorized User through the Services.

(c) "**Documentation**" means Provider's end user documentation relating to the Services.

(d) **"Personal Information"** means any information relating to an identified or identifiable individual.

(e) "**Provider IP**" means the Services, the Documentation, and any and all intellectual property provided to Customer or any Authorized User in connection with the foregoing and any improvements or modifications thereto. For the avoidance of doubt, Provider IP does not include Customer Data.

(f) "**Services**" means the software-as-a-service offering described in the applicable Service Order.

(g) **"Service Order"** means the ordering document specifying the Services to be provided by Provider and applicable fees payable by Customer, which is subject to the provisions of this Agreement.

2. <u>Access and Use</u>.

(a) <u>Provision of Access</u>. Provider hereby grants Customer a worldwide, non-exclusive, non-transferable (except in compliance with Section 11(g)) right to access and use the Services during the Term, solely for use by Authorized Users in accordance with the terms and conditions herein, as further set forth in the applicable Service Order. Such use is limited to Customer's internal use. Provider shall provide to Customer the necessary passwords and network links or connections to allow Customer to access the Services following the Order Effective Date.

(b) <u>Documentation License</u>. Provider hereby grants to Customer a non-exclusive, non-sublicensable, non-transferable (except in compliance with Section 11(g)) license to use the Documentation during the Term solely for Customer's internal business purposes in connection with its use of the Services.

(c) Use Restrictions. Customer shall not use the Services for any purposes beyond the scope of the access granted in this Agreement. Without limiting the generality of the foregoing, Customer shall not at any time, directly or indirectly, and shall not permit any Authorized Users to: (i) copy, modify, or create derivative works of the Services or Documentation, in whole or in part; (ii) rent, lease, lend, sell, license, sublicense, assign, distribute, publish, transfer, or otherwise make available the Services or Documentation available to any third party; (iii) reverse engineer, disassemble, decompile, decode, adapt, or otherwise attempt to derive or gain access to any software component of the Services, in whole or in part; or (iv) remove any proprietary notices from the Services or Documentation.

(d) Independent Development. Customer's use of the Services or Documentation shall not preclude Customer from independently developing or supporting competing offerings, or working with third parties that offer competitive of similar Services, provided such activities do not result in the infringement of Provider's intellectual property rights, the misappropriation of Provider's trade secrets, or breach of confidentiality obligations hereunder.

3. Provider Obligations.

(a) Service Levels and Support. Provider shall make the Services available in accordance with the service levels set out in the applicable Service Order. The access rights granted hereunder entitles Customer to the support services described in the Service Order for the duration of the Order Term. Provider shall maintain a business continuity and disaster recovery plan for the Services and implement such plan in the event of any unplanned interruption of the Services.

(b) Privacy. Provider does not require any Personal Information from Customer or any of its customers or end users in order to provide the Services. Accordingly, neither Customer nor any of its Authorized Users shall transmit into the Services or otherwise provide or make available to Provider any Personal Information in connection with the Services or this Agreement. However, in the event and to the extent Provider inadvertently receives and processes any Personal Information in the course of providing the Services, Provider shall comply with all applicable privacy laws and regulations.

(c) Security.

(i) Throughout the Term and at all times in connection with its actual or required performance of the Services hereunder, Provider shall ensure that commercially reasonable security measures are employed to protect all Customer Data processed hereunder.

(ii) Provider shall be solely responsible for the information technology infrastructure, including all computers, software, databases, electronic systems (including database management systems), and networks used by or for Provider to access the Customer Systems or otherwise to provide the Services ("**Provider Systems**") and shall use commercially reasonable efforts designed to prevent unauthorized access to the Customer Data through the Provider Systems.

4. Fees and Payment.

(a) Fees. Customer shall pay Provider the fees set forth in the Service Order ("**Fees**"). Provider shall invoice Customer for all Fees in accordance with the invoicing schedule and requirements set forth in the Service Order. Customer shall pay all undisputed invoices within forty-five (45) days after Customer's receipt of a proper invoice. Customer shall make all payments hereunder in US dollars.

(b) Payment Disputes. Customer may withhold from payment any and all payments of Fees that Customer disputes in good faith, pending resolution of such dispute. Provider shall not fail to perform any obligation hereunder by reason of Customer's good faith withholding of any Fees in accordance with this Section 4(b).

(c) Late Payments. Provider reserves the right (in addition to any other rights or remedies Provider may have) to suspend Customer and all Authorized Users' access to the Services if, after Provider provides written notice of overdue Fees to Customer, such overdue Fees have not been paid within fifteen (15) days of the date of such notice, until such amounts are paid in full.

(d) Taxes. All Fees and other amounts payable by Customer under this Agreement are exclusive of taxes and similar assessments. Customer is responsible for all sales, use, and excise taxes, and any other similar taxes, duties, and charges of any kind imposed by any federal, state, or local governmental or regulatory authority on any amounts payable by Customer hereunder, other than any taxes imposed on Provider's income.

5. Confidential Information. From time to time during the Term, either Party may disclose or make available to the other Party information about its business affairs, products, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information in written or electronic form or media, and whether or not marked, designated, or otherwise identified as "confidential" (collectively, "**Confidential Information**"). Confidential Information does not include information that, at the time of disclosure is: (a) in the public domain; (b) known to the receiving Party on a non-confidential basis at the time of disclosure; (c) rightfully obtained by the receiving Party on a non-confidential basis from a third party; or (d) independently developed by the receiving Party without reference to the disclosing Party's Confidential Information. The receiving Party shall not disclose the disclosing Party's Confidential Information to any person or entity, except to the receiving Party's employees who have a need to know the Confidential Information for the receiving Party to exercise its rights or perform its obligations hereunder. Notwithstanding the foregoing, each Party may disclose Confidential Information to the limited extent required (i) in order to comply with the order of a court or other governmental body, or as otherwise necessary to comply with applicable law, provided that the Party making the disclosure pursuant to the order, to the extent permitted by law, shall first have given written notice to the other Party and made a reasonable effort to obtain a protective order; or (ii) to establish a Party's rights under this Agreement, including to make required court filings. On the expiration or termination of the Agreement, the receiving Party shall promptly return to the disclosing Party all copies, whether in written, electronic, or other form or media, of the disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the disclosing Party that such Confidential Information has been destroyed. Each Party's obligations of non-disclosure with regard to Confidential Information are effective as of the Effective Date and will expire five (5) years from the date first disclosed to the receiving Party; provided, however, with respect to any Confidential Information that constitutes a trade secret (as determined under applicable law), such obligations of non-

disclosure will survive the termination or expiration of this Agreement for as long as such Confidential Information remains subject to trade secret protection under applicable law.

6. Intellectual Property Ownership.

(a) Provider IP. Customer acknowledges that, as between Customer and Provider, Provider owns all right, title, and interest, including all intellectual property rights, in and to the Provider IP.

(b) Customer Data. Provider acknowledges that, as between Provider and Customer, Customer owns all right, title, and interest, including all intellectual property rights, in and to the Customer Data. Customer hereby grants to Provider a non-exclusive, non-transferable (except in compliance with Section 11(g)), royalty-free, worldwide license to reproduce, distribute, and use and display the Customer Data solely to the extent necessary for Provider to provide the Services to Customer and, provided that the Customer Data is aggregated and anonymized, to further develop and improve the Service and related technology.

(c) Feedback. Both during and after the Term, Provider may, without any obligations or compensation to Customer, use any suggestions, enhancement requests, recommendations or other feedback obtained in the course of providing the Services or otherwise provided by Customer, including Authorized Users, related to the Services.

7. Warranties and Warranty Disclaimer.

(a) Provider warrants that during the Term of this Agreement, that:

(i) it has, and throughout the Term, will have, the unconditional and irrevocable right, power, and authority, including all permits and licenses required, to provide the Services and grant and perform all rights and licenses granted or required to be granted by it under this Agreement;

(ii) neither Provider's grant of the rights or licenses hereunder nor its performance of any Services or other obligations under this Agreement does or at any time will, with respect to the Services as Provider makes them available: (i) conflict with or violate any applicable law, including any law relating to data privacy, data security, or Personal Information; (ii) require the consent, approval, or authorization of any governmental or regulatory authority or other third party; or (iii) require the provision of any payment or other consideration by Customer or any Authorized User to any third party, and Provider shall promptly notify Customer in writing if it becomes aware of any change in any applicable law that would preclude Provider's performance of its obligations hereunder;

(iii) there is no settled, pending, or threatened claim, lawsuit, arbitration, inquiry, or investigation, and it has not received any written, oral, or other notice of thereof: (i) alleging that any access to or use of the Services does or would infringe, misappropriate, or otherwise violate any intellectual property rights of any third party; (ii) challenging Provider's ownership of, or right to use or license, any software or other materials used or required to be used in connection with the performance, accessing, or use of the Services, or alleging any adverse right, title, or interest with respect thereto; or (iii) that, if decided

unfavorably to Provider would reasonably be expected to have an actual or potential adverse effect on its ability to perform the Services or its other obligations under this Agreement, and it has no knowledge of any factual, legal, or other reasonable basis for any such litigation, claim, or proceeding;

(iv) the Services as made available by Provider will materially conform to and perform in accordance with the Documentation and all requirements of this Agreement, including any uptime commitments herein;

(v) the Services as made available by Provider are and will remain free of any virus, trojan horse, worm, backdoor, or other harmful code; and

(vi) Provider will perform all Services in a professional and workmanlike manner in accordance with industry standards and practices for similar services, using personnel with the requisite skill, experience, and qualifications, and shall devote adequate resources to meet its obligations under this Agreement.

(b) EXCEPT FOR THE WARRANTIES SET FORTH IN SECTION 7(a), THE SERVICES AND DOCUMENTATION ARE PROVIDED “AS IS” AND PROVIDER HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. PROVIDER SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE, OR TRADE PRACTICE.

8. Indemnification.

(a) Provider shall indemnify, defend, and hold harmless Customer from and against any and all losses, damages, liabilities, costs (including reasonable attorneys' fees) ("**Losses**") incurred by Customer resulting from any third-party claim, suit, action, or proceeding ("**Third-Party Claim**") that (i) the Provider IP, or any use of the Services in accordance with this Agreement and as made available by Provider, infringes or misappropriates such third party's intellectual property rights, (ii) arises from Provider’s gross negligence or willful misconduct, or Provider’s violation of applicable law or regulation, or (iii) any unauthorized access to Customer Data caused by Provider or other breach of any confidentiality or security commitment of Provider; provided that Customer promptly notifies Provider in writing of the claim, reasonably cooperates with Provider at Provider's expense, and allows Provider sole authority to control the defense and settlement of such claim.

(b) If such a claim is made or appears possible, Customer agrees to permit Provider, at Provider's sole expense, to (A) modify or replace the Provider IP, or component or part thereof, to make it non-infringing, or (B) obtain the right for Customer to continue use. If neither of these alternatives are commercially reasonable, Provider may terminate this Agreement, in its entirety or with respect to the affected component or part, effective immediately on written notice to Customer, provided that Provider shall refund or credit to Customer all amounts Customer paid in respect of the Provider IP that Customer cannot reasonably use as intended under this Agreement.

(c) Customer shall indemnify, defend, and hold harmless Provider from and against any and all Losses incurred by Provider resulting from any Third-Party Claim that (i) Customer Data infringes or misappropriates such third party's intellectual property rights; or (ii) arises from Customer's gross negligence or willful misconduct.

(d) The indemnifying party's obligations as set forth above are expressly conditioned upon each of the foregoing: (a) the indemnified party will promptly notify the indemnifying party in writing of any threatened or actual claim or suit; (b) the indemnifying party will have sole control of the defense or settlement of any claim or suit; and (c) the indemnified party will cooperate with the indemnifying party to facilitate the settlement or defense of any claim or suit.

9. Limitations of Liability. EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS SECTION 9, IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER OR IN CONNECTION WITH THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE, FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, ENHANCED, OR PUNITIVE DAMAGES, REGARDLESS OF WHETHER EITHER PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE. EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS SECTION 9, IN NO EVENT WILL THE AGGREGATE LIABILITY OF EITHER PARTY ARISING OUT OF OR RELATED TO THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE EXCEED 1 TIMES THE TOTAL AMOUNTS PAID AND AMOUNTS ACCRUED BUT NOT YET PAID TO PROVIDER UNDER THIS AGREEMENT IN THE 1 YEAR PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM. The exclusions and limitations in this Section 9 do not apply to claims for (i) indemnification, or (ii) arising from confidentiality obligations.

10. Term and Termination.

(a) Term. The term of this Agreement begins on the Effective Date and, unless terminated earlier pursuant to this Agreement's express provisions, will continue in effect until two (2) years from such date (the "**Initial Term**"); thereafter, this Agreement may, on mutual, written agreement, renew for successive one-year periods (each, a "**Renewal Term**" and together with the Initial Term, the "**Term**"); provided, that any Service Order entered into hereunder shall remain subject to the terms of this Agreement for the duration thereof, to the extent the term of such Service Order exceeds the Term.

(b) Termination. In addition to any other express termination right set forth in this Agreement:

(i) either Party may terminate this Agreement, and/or any Service Order thereunder, effective on written notice to the other Party, if the other Party materially breaches this Agreement, and such breach: (A) is incapable of cure; or (B) being capable of cure, remains uncured thirty (30) days after the non-breaching Party provides the breaching Party with written notice of such breach; or

(ii) either Party may terminate this Agreement, and/or any Service Order thereunder, effective immediately upon written notice to the other Party, if the other Party: (A) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (B) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (C) makes or seeks to make a general assignment for the benefit of its creditors; or (D) applies for or has appointed a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

(c) Effect of Expiration or Termination. Upon expiration or earlier termination of this Agreement, Customer shall immediately discontinue use of the Provider IP, and Customer shall delete, destroy, or return all copies of the Provider IP.

(d) Survival. This Section 10(d) and Sections 1, 2(c), 4, 5, 6, 8, 9, 10(c) and 11 survive any termination or expiration of this Agreement. No other provisions of this Agreement survive the expiration or earlier termination of this Agreement.

11. Miscellaneous.

(a) Entire Agreement. This Agreement, together with any other documents incorporated herein by reference and all related Exhibits, constitutes the sole and entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all prior and contemporaneous understandings, agreements, and representations and warranties, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements made in the body of this Agreement, the related Exhibits, and any other documents incorporated herein by reference, the following order of precedence governs: (i) first, this Agreement, excluding its Exhibits; (ii) second, the Exhibits to this Agreement as of the Effective Date; and (iii) third, any other documents incorporated herein by reference.

(b) Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") must be in writing and addressed to the Parties at the addresses set forth on the first page of this Agreement (or to such other address that may be designated by the Party giving Notice from time to time in accordance with this Section). All Notices must be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage pre-paid). Except as otherwise provided in this Agreement, a Notice is effective only: (i) upon receipt by the receiving Party; and (ii) if the Party giving the Notice has complied with the requirements of this Section.

(c) Amendment and Modification; Waiver. No amendment to or modification of this Agreement is effective unless it is in writing and signed by an authorized representative of each Party. No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, (i) no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof, and (ii) no single or partial exercise of any

right, remedy, power, or privilege hereunder will preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

(d) Severability. If any provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect their original intent as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(e) Governing Law; Submission to Jurisdiction. This Agreement is governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware. Any legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder will be instituted exclusively in the appropriate state or federal courts located in the State of Delaware, each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding.

(f) Force Majeure. Any delay in the performance of any duties or obligations of either Party (except for the obligation to pay Fees owed) will not be considered a breach of this Agreement if such delay is caused by a labor dispute, shortage of materials, war, fire, earthquake, typhoon, flood, natural disasters, governmental action, or any other event beyond the control of such Party, provided that such Party uses reasonable efforts, under the circumstances, to notify the other Party of the circumstances causing the delay and to resume performance as soon as possible.

(g) Assignment. Neither Party may assign any of its rights or delegate any of its obligations hereunder, in each case whether voluntarily, involuntarily, by operation of law or otherwise, without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed; provided, however, that either Party may assign its rights or delegate its obligations, in whole or in part, without such consent to (i) one of its affiliates, or (ii) an entity that acquires all or substantially all of the business or assets of such Party to which this Agreement pertains, whether by merger, reorganization, acquisition, sale, or otherwise. Any purported assignment or delegation in violation of this Section will be null and void. No assignment or delegation will relieve the assigning or delegating Party of any of its obligations hereunder. This Agreement is binding upon and inures to the benefit of the Parties and their respective permitted successors and assigns.

(h) Export Regulation. Customer shall comply with all applicable federal laws, regulations, and rules, and complete all required undertakings (including obtaining any necessary export license or other governmental approval), that prohibit or restrict the export or re-export of the Services or any Customer Data outside the US.

(i) Independent Contractors. Customer's relationship to Provider is that of an independent contractor, and neither Party is an agent or partner of the other. Customer

will not have, and will not represent to any third party that it has, any authority to act on behalf of Provider.

(j) Equitable Relief. Each Party acknowledges and agrees that a breach or threatened breach by such Party of any of its obligations under Section 5 would cause the other Party irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to seek equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy. Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity, or otherwise.

(k) Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

(l) Publicity. Both parties agree to publicity once performance is operating in a steady state and with aligned agreement on the content thereof, in good faith. At that time, Provider may use Customer's name and logo on Provider's website, public customer lists, and case studies for marketing. Customer may review and make reasonable request to modify or remove any such use.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

| FABER LABS, INC. | FETCH REWARDS, LLC |
|---|---|
| By: Zoe Weil | By: Wade Bruce |
| Name: Zoe Weil | Name: Wade Bruce |
| Title: Co-founder/CEO | Title: CTO |
| Date: December 6, 2024 | Date: December 6, 2024 |

# EXHIBIT B

(FILED WITH REDACTIONS)

**SERVICE ORDER #1**

This Service Order #1 ("**Order**") is entered into as of December 15, 2024 ("**Order Effective Date**") by and between Fetch Rewards, LLC ("**Customer**") and Faber Labs, Inc. (**"Provider**"), pursuant to the terms and conditions of the Master Service Agreement dated December 15, 2024 between Customer and Provider ("MSA").

1. Services.
   a. Services to be provided: a ranking and retrieval service that enables results for each individual Customer user, available via API, designed or customized to operate with Customer's environment and subject to configuration or modification at Customer's request, with the following enabled characteristics: Personalized Search, Personalized Recommendations, and Conversational Discovery.
   b. Provider will maintain, and permit Customer access to, a dashboard that monitors performance via performance metrics derived from Service performance, inclusive of the following: recall, precision, MRR, NDCG, coverage, diversity score, etc.; and system telemetry.
   c. Service Levels:
      i. Latency: [redacted]
      ii. Uptime: [redacted]
      iii. Failure to achieve the availability required per section 1(b)(ii) shall entitle Customer to a credit against fees as follows: [redacted]
   d. Limitations: Any load testing requires 24 hours' written notice.
   e. Support:
      i. Provider to provide debugging support;
      ii. Support and troubleshooting to be provided via Slack and synchronously at Customer's request. Provider will ensure that at least one support contact is available during normal business hours.
      iii. Provider to provide weekly "office hours" for Customer engineers/data scientists to meet with Provider team and ask questions.
   f. Term: The term of this Order ("**Order Term**") shall be two (2) years following the Effective Date.

i. Thereafter, this Order will automatically renew for successive one (1)-year periods unless either Party provides non-renewal notice at least ninety (90) days prior to the end of the then-current Order Term.

2. Fees. Customer agrees to pay Provider the following Fees:

a. [redacted], payable at the beginning of each contract year.

b. Infrastructure fees will accrue monthly and vary depending on usage (measured as “requests per second” of Customer requests engaging Provider endpoints, or “RPS”), as follows:

i. Minimum Infra Fee. Subject to Subsection 2(b)(iii), Customer shall pay a minimum monthly infrastructure fee of [redacted], which shall enable Customer to use up to [redacted] (“Minimum Infra Fee”);

ii. Overage Fee. Overages beyond [redacted] shall accrue in [redacted]

iii. [redacted]

c. The Fees described in this Section 2 shall remain in effect during any applicable Renewal hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Order as of the Order Effective Date.

FABER LABS, INC.

By: Zoe Weil

Name: Zoe Weil

Title: Co-founder/CEO

Date: December 6, 2024

FETCH REWARDS, LLC

By: Wade Bruce

Name: Wade Bruce

Title: CTO

Date: December 6, 2024



310885994 v4

# EXHIBIT C

(FILED WITH REDACTIONS)

# Amended and Restated Service Order #2 Fetch Rewards

This Amended and Restated Service Order #1 ("Order Form") is entered into between and among Fetch Rewards, LLC ("**Customer**") and Sequen AI, Inc., f/k/a Faber Labs, Inc. ("**Sequen AI**") (collectively, the "**Parties**") and is effective as of the Subscription Start Date listed below (the "**Order Form Effective Date**"). This Order Form amends and restates in full that certain original Service Order #1, dated December 15, 2024, which is hereby superseded in full, and is governed by the previously negotiated Faber Labs Terms and Conditions, dated December 15, 2024 (the "**Master Service Agreement**"), which is incorporated hereinto by reference. Capitalized terms used herein and not otherwise herein defined are used as defined elsewhere in the Master Service Agreement. In the event any terms or conditions of this Order Form conflict with the terms and conditions of the Master Service Agreement, the terms and conditions of the Master Service Agreement shall control to the extent of the conflict, unless this Order Form expressly states that a specific provision of this Agreement will be superseded by a specific provision of this Order Form.

| **Customer** | | | |
|---|---|---|---|
| Billing Address | 1050 E. Washington Ave., Madison, WI 53703 | | |
| Billing Contact Name | [redacted] | Business Contact Name | [redacted] |
| Billing Contact Email | [redacted] | Business Contact Email | [redacted] |
| **Order Form Details** | | | |
| Number of Sequen AI Models | Six | | |
| Subscription Start Date | 4/1/26 | | |
| Subscription Term | 12 months | | |
| Subscriptions Fees: | [redacted] | | |
| Order Description | - Sequen Ranking Platform License<br>- [redacted]<br>    - [redacted]<br>    - [redacted]<br>    - [redacted]<br>    - [redacted] (d))<br>- Sequen Ranktune License<br>    - [redacted] | | |
| Billing Frequency | Monthly in arrears | | |
| Payment Terms | NET 45 from receiving a valid invoice | | |
| Overages | [redacted]<br><br>Overages calculated by Sequen AI for requests to Customer production recommendations API monthly.<br><br>Notwithstanding the foregoing, API usage incurred by Customer due to outages or other technical failures of Sequen shall not count against Customer's monthly API call allotment.<br><br>Ranktune Training Hours are uncapped for the initial 12 month term of this agreement. Upon renewal Ranktune Training Hours overages to be billed at the current market rate. | | |
| Overage Billing Frequency | Monthly in Arrears | | |

**Services**

Sequen shall provide the following Services to Customer:

(a) [redacted]

(b) [redacted]

**(c)** [redacted]

(d) [redacted]

- [redacted]
- [redacted]
- [redacted]

(e) [redacted]

(f) Sequen will maintain, and permit Customer access to Rumi, a dashboard that monitors performance.

**Data Use Restrictions.**
Fetch Rewards data to only be used solely for their copy of Sequen AI's models to improve and provide services to Fetch Rewards. For clarity, no other customer and the generalized models shall benefit from Fetch Rewards data.

**Exclusivity.**

[redacted]

**Non-Solicitation.**

During the Subscription Term and for six (6) months thereafter, Sequen shall not, directly or indirectly, solicit for employment or hire any employee of Customer without the prior written consent of Customer.

**Confidentiality.**

The Parties acknowledge that all Customer Data is "Confidential Information" under Section 5 of the MSA, all copies of which shall be deleted at the expiration of this Order Form as discussed therein.

**Service Level Agreement**

A) [redacted]

B) [redacted]

Service Level Credit Table:

Failure to achieve the availability required per section B shall entitle Customer to a credit against fees as follows:

| Monthly Uptime % | Service Fee Credit |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

**Support:**

i. Sequen to provide debugging support.

ii. Support and troubleshooting to be provided via Slack and synchronously at Customer's request. Sequen will ensure that at least one support contact is available during normal business hours.

iii. Sequen to provide weekly "office hours" for Customer engineers/data scientists to meet with Sequen team and ask questions.

**Enterprise License Agreement Option.**

Fetch Rewards may elect to opt in to an uncapped Enterprise License Agreement (ELA) by **June 30, 2026** with an updated Order Form. [redacted] For clarity, the Parties acknowledge that such ELA will supersede the obligations under this Agreement.

**Order Form Term**. This Order Form shall commence on the Order Form Effective Date and terminate immediately upon the expiration of the Subscription Term, unless the Parties have entered into an additional Order Form or otherwise have renewed or extended the subscription through mutual written agreement.

By signing this Order Form on behalf of Customer, the signatory represents and warrants that he or she is authorized to enter into this Order Form on Customer's behalf and bind Customer to this Order Form (and the Sequen AI Terms and Conditions incorporated herein).

Signatures to Follow

**IN WITNESS WHEREOF**, the Parties have executed this Order Form as a sealed instrument, effective as of the date and year first written above.

| **Fetch Rewards, LLC** | **Sequen AI, Inc.** |
|---|---|
| Signature: G. Gowtham | Signature: Zoe Frances Weil |
| Print Name: Gowtham Gundu | Print Name: Zoe Weil |
| Title: Chief AI Officer | Title: CEO |
| Date: 3/27/2026 | Date: 3/26/2026 |

# EXHIBIT D

# AMENDMENT TO MASTER SERVICES AGREEMENT

This Amendment to Master Services Agreement (this **"Amendment"**) is entered into as of May __, 2026 (the **"Effective Date"**), by and between **Fetch Rewards, LLC** a Delaware company ("**Fetch**"), and **Sequen, Inc.**, a Delaware corporation, formerly known as Faber Labs, Inc. ("**Vendor**"). Fetch and Vendor are each referred to herein as a "**Party**" and collectively as the "**Parties**".

## RECITALS.

A. The Parties entered into a Master Services Agreement dated December 15, 2024 (as previously amended or supplemented, the **"Agreement"**);

B. The Parties desire to authorize Vendor to embed certain of its personnel within Fetch's technical environment on a temporary basis to perform services described in the Agreement, and to establish the terms and conditions governing such access; and

C. The Parties wish to amend the Agreement to reflect necessary contractual commitments and other details relevant to embedding Vendor personnel with Fetch.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### 1.. Definitions

1.1 **"Embedded Personnel"** means any individual employed by or contracted to Vendor who is granted access to Fetch Systems pursuant to this Amendment, as identified in Schedule 1 hereto (as updated from time to time by mutual written agreement of the Parties).

1.2 **"Fetch Systems"** means Fetch's internal software systems, source code repositories, development environments, databases, infrastructure, networks, and any other technology assets or platforms to which Embedded Personnel are granted access under this Amendment.

1.3 **"Work Product"** means all code, software, algorithms, models, documentation, configurations, data structures, designs, and other deliverables or materials created, developed, or contributed by Embedded Personnel in connection with services performed for Fetch to the extent created while working on or in Fetch Systems, whether in whole or in part, during the term of this Amendment.

1.4 **"Fetch Policies"** means Fetch's then-current acceptable use, information security, data handling, code of conduct, and related internal policies, as communicated to Vendor or Embedded Personnel from time to time.

1.5 **"NDA"** means the nondisclosure agreement in the form attached hereto as **Exhibit A**.

### 2.. Authorization of Embedded Personnel

2.1 Subject to the terms and conditions of this Amendment and the Agreement, Fetch hereby authorizes Vendor to make Embedded Personnel available to perform services within Fetch Systems on a temporary, non-exclusive basis during the term of this Amendment.

2.2 The authorization granted under Section 2.1 is limited to the individuals identified in Schedule 1. Vendor shall provide reasonable advance written notice to Fetch before any change to the list of Embedded Personnel. Fetch reserves the right to approve or reject any proposed Embedded Personnel member in its reasonable discretion.

2.3 Embedded Personnel are and shall remain employees or contractors of Vendor. Nothing in this Amendment creates an employment, agency, joint venture, or partnership relationship between Fetch and any Embedded Personnel member. Vendor is solely responsible for all compensation, benefits, taxes, and employment obligations with respect to Embedded Personnel.

**3.. Conditions Precedent to Access**

3.1 Fetch's grant of access to Fetch Systems is conditioned upon satisfaction of each of the following prior to access being provisioned:

- Execution of NDA. Each Embedded Personnel member must execute an NDA directly with Fetch before access to any Fetch Systems is provisioned. Vendor shall ensure that each Embedded Personnel member executes the NDA and shall provide Fetch with a countersigned copy upon request.
- IT Onboarding. Embedded Personnel must complete Fetch's standard contractor IT onboarding process, including identity verification and any applicable security training.
- Background Screening. Vendor represents and warrants that all Embedded Personnel have been subject to appropriate background checks as a precedent to or as a part of their employment or contracting with Vendor.

**4.. Vendor Obligations Regarding Embedded Personnel**

4.1 Vendor shall be responsible for ensuring that Embedded Personnel comply with (a) the terms of the NDAs, (b) Fetch Policies, and (c) all applicable laws and regulations in connection with their access to and use of Fetch Systems.

4.2 Vendor shall promptly notify Fetch in writing (and in any event within twenty-four (24) hours) upon becoming aware of (a) any actual or suspected unauthorized access to, or misuse of, Fetch Systems by Embedded Personnel; (b) any actual or suspected breach of an NDA or Fetch Policy by Embedded Personnel; or (c) the termination of any Embedded Personnel member's employment or engagement with Vendor.

4.3 Vendor shall ensure that Embedded Personnel do not bring onto or incorporate into any Work Product any third-party intellectual property (including open-source software with restrictive license terms) without Fetch's prior written approval.

4.4 Vendor shall cooperate fully with Fetch in connection with any investigation of potential misuse of Fetch Systems or breach of this Amendment by Embedded Personnel.

**5.. Intellectual Property**

*This Section 5 shall not apply unless Vendor and Fetch agree in a Statement of Work that Vendor will develop and deliver Work Product for Fetch. Notwithstanding the foregoing, Vendor shall at all times retain all rights, title, interest and ownership of Vendor’s pre-existing intellectual property, including without limitation Vendor’s products, technology and services, and all modifications, updates, upgrades, enhancements and derivatives thereof. Works created by Fetch that rely in whole or in part on advice or consultation of Vendor are not derivatives of Vendor’s pre-existing intellectual property or otherwise subject to ownership by Vendor.*

5.1 **Assignment.** All Work Product created by Embedded Personnel for use on or in connection with Fetch Systems, shall be and hereby is assigned to Fetch upon creation, free and clear of any claims by Vendor or Embedded Personnel. To the extent so required, Vendor shall cause each Embedded Personnel member to assign all Work Product to Fetch. To the extent any Work Product does not qualify as a "work made for hire" under applicable law, Vendor hereby

irrevocably assigns to Fetch all right, title, and interest in and to such Work Product, including all intellectual property rights therein.

5.2 **Further Assurances.** Vendor shall, and shall cause Embedded Personnel to, execute such additional documents and take such further actions as Fetch may reasonably request to evidence, perfect, or enforce Fetch's ownership of Work Product.

5.3 **Relationship to Agreement.** This Section 5 supplements and does not replace any intellectual property provisions in the Agreement. To the extent of any conflict between this Amendment and the Agreement with respect to Work Product created by Embedded Personnel, this Amendment controls.

### 6.. Access Control and Revocation

6.1 Fetch may suspend or terminate any Embedded Personnel member's access to Fetch Systems at any time, for any reason or no reason, upon notice to Vendor (which notice may be contemporaneous with or follow the suspension). In cases of actual or suspected security incident, misuse, or policy violation, Fetch may suspend access immediately without prior notice.

6.2 Upon expiration or termination of this Amendment, or upon termination of any Embedded Personnel member's engagement with Vendor, Vendor shall promptly (and in any event within one (1) business day) notify Fetch so that Fetch may revoke the applicable access credentials. Vendor shall ensure that Embedded Personnel return or destroy all Fetch Confidential Information upon such termination.

6.3 Fetch shall maintain logs of Embedded Personnel access to Fetch Systems and may audit such access in its reasonable discretion.

### 7.. Confidentiality

7.1 The confidentiality provisions of the Agreement apply in full to Embedded Personnel's access to and use of Fetch Systems and any Fetch Confidential Information encountered in connection therewith. Vendor shall ensure that Embedded Personnel are bound by confidentiality obligations no less protective of Fetch's interests than those set forth in the Agreement.

7.2 Vendor acknowledges that Embedded Personnel may have access to Fetch source code, technical architecture, user data environments, or other sensitive Confidential Information. Vendor shall implement and maintain reasonable internal controls to prevent unauthorized disclosure of such information.

### 8.. Term

8.1 This Amendment shall be effective as of the Effective Date and shall continue until the earlier of (a) the termination or expiration of the Agreement, or (b) written notice of termination by either Party upon 30 days' prior written notice. Termination of this Amendment shall not terminate any active SOWs or orders, which shall continue to be governed by the terms of this Amendment. Sections 4, 5, 6, 7, and 9 shall survive any termination or expiration of this Amendment.

### 9.. General

9.1 Except as expressly modified herein, the Agreement remains in full force and effect without amendment, and all terms and conditions thereof are incorporated herein by reference. In the event of any conflict between this Amendment and the Agreement, this Amendment shall control solely with respect to the subject matter of Embedded Personnel access.

9.2 This Amendment, together with the Agreement and the Exhibit hereto, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior understandings or agreements relating thereto.

9.3 This Amendment may be executed in counterparts, each of which shall be deemed an original, and electronic signatures shall be deemed valid.

9.4 This Amendment shall be governed by the laws of the State of Delaware without regard to its conflict of law provisions, consistent with the Agreement.

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the Effective Date.

**FETCH REWARDS, LLC**

Ori Schnaps

Name: Ori Schnaps

Title: CTO

Date: 5/7/2026

**SEQUEN, INC.**

Zoe Frances Weil

Name: Zoe weil

Title: CEO

Date: 5/11/2026

## SCHEDULE 1

***Authorized Embedded Personnel***

The following individuals are authorized as Embedded Personnel under this Amendment, subject to completion of all conditions in Section 3:

| Name | Title / Role | Access Start Date | Access End Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

This Schedule may be updated by written agreement of the Parties' authorized representatives without formal amendment to this Amendment.

**EXHIBIT A**

This **Nondisclosure Agreement** (the "**Agreement**"), dated as of _____________, 2026 (the "**Effective Date**"), is between Fetch Rewards, LLC, a Delaware limited liability company ("**Fetch**"), located at 1050 E. Washington Ave., 2nd Floor, Madison, WI 53703, and ____________________________________ ("**Embedded Personnel**"), located at ____________________________________ (each, a "**Party**"; together, the "**Parties**"). In the furtherance of the business engagement between the Parties, each Party may disclose sensitive information to the other. The parties hereby agree as follows:

1. CONFIDENTIAL INFORMATION, DEFINED. Each Party (in such capacity, as "**Receiving Party**") hereby agrees to hold in confidence, in accordance with the terms and conditions hereof, any confidential information it may obtain from the other Party (in such capacity, the "**Disclosing Party**") regarding its business including, but not limited to: technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, inventions, processes, techniques, information relating to employees and consultants, suppliers, pricing and pricing methodologies, cost data, market-share data, marketing plans, contract information, business plans, financial forecasts, historical financial data, budgets, or other proprietary business information (the "**Confidential Information**"). Each Party acknowledges that the Confidential Information is proprietary and valuable to the Disclosing Party. The Receiving Party agrees not to disclose, directly or indirectly, the Disclosing Party's Confidential Information to any unaffiliated third party without the Disclosing Party's prior written consent, provided that the Receiving Party may disclose such information to the Receiving Party's employees, officers, directors, consultants, auditors, advisors or other representatives (those of the foregoing to whom Confidential Information is disclosed hereunder will be referred to herein as the Receiving Party's "**Representatives**") only in connection with exercising its rights and/or fulfilling its obligations hereunder.

2. EXCEPTIONS. Notwithstanding anything to the contrary in this Agreement, Confidential Information will not include any information which: (i) is or becomes publicly available without breach of this Agreement by the Receiving Party or its Representatives; (ii) was available to the Receiving Party or any of its Representatives prior to its disclosure hereunder; (iii) is acquired by the Receiving Party or any of its Representatives from a source not known by the Receiving Party or such Representative(s) to have breached any obligation of confidentiality to the Disclosing Party in its disclosure of such information; (iv) is disclosed to any third party by or with the permission of the Disclosing Party (this exception applies only to the particular information disclosed and the particular third party for whom the Disclosing Party provided permission for any such disclosure); (v) is independently developed by or on behalf of the Receiving Party or any of its Representatives without reference to the Confidential Information. The Receiving Party is also permitted to disclose the Confidential Information as required pursuant to, or in connection with, any applicable law, rule, regulation, examination, investigation, or procedure of, under or before any governmental agency, self-regulatory organization or court of competent jurisdiction.

3. DESTRUCTION OF CONFIDENTIAL INFORMATION. If requested in writing by the Disclosing Party at any time following the Term of this Agreement, the Receiving Party shall destroy all Confidential Information in its possession, as well as all information, records and materials developed therefrom. The Receiving Party and its Representatives, however, (i) may retain Confidential Information pursuant to its compliance or document-retention policies and for the purpose of defending its rights and obligations hereunder, but for the avoidance of doubt, may

not use any such Confidential Information after the Term; and (ii) are not required to return or destroy any computer or other electronic hardware or systems, to render any electronic data irrecoverable or to disable any existing electronic data backup procedures (or destroy any data contained therein); provided that any Confidential Information so retained may not be accessed by the Receiving Party or its Representatives in the ordinary course of business and will only be accessed by legal, compliance or technology personnel in connection with the purposes for which such information may be retained hereunder.

4. NO WARRANTIES OR LICENSES**.** All Confidential Information is provided AS IS. Disclosing Party will not be liable to Receiving Party for damages arising from any use of the Confidential Information, from errors, omissions or otherwise. All of Disclosing Party's rights in and to its Confidential Information remain the exclusive property of Disclosing Party. Neither this Agreement, nor any disclosure of Confidential Information hereunder (a) grants to Receiving Party any right or license under any copyright, patent, mask work, trade secret or other intellectual property right, except solely for the use expressly permitted herein, (b) obligates either Party to disclose or receive any information, perform any work or enter into any agreement, (c) limits either Party from developing, manufacturing or marketing products or services that may be competitive with those of the other except insofar as this Agreement limits the use and disclosure of Confidential Information, (d) limits either Party from assigning or reassigning its employees in any way or (e) limits either Party from entering into any business relationship with third parties.

5. TERMINATION**.** This Agreement will terminate as to the further exchange of Confidential Information 10 days after receipt by one Party of written notice of termination from the other. Receiving Party's obligations under this Agreement, as they apply to any Confidential Information disclosed prior to termination, will survive termination for 1 year; provided, Receiving Party's obligations hereunder shall survive and continue in effect thereafter with respect to any Confidential Information that is a trade secret under applicable law.

6. REMEDIES**.** Due to the unique nature of the Confidential Information, the parties agree that any breach or threatened breach of this Agreement will cause not only financial harm to Disclosing Party, but also irreparable harm for which money damages will not be an adequate remedy. Therefore, in addition to any other legal or equitable remedies, Disclosing Party shall be entitled to an injunction or similar equitable relief against any such breach or threatened breach without the necessity of proving actual damages or posting any bond.

7. GENERAL**.** This Agreement constitutes the entire agreement, and supersedes all prior negotiations, understandings, or agreements (oral or written), between the parties concerning the subject matter hereof. This Agreement may be executed in one or more counterparts, each of which is an original, but taken together constituting one and the same instrument. Execution of an electronic copy shall have the same force and effect as execution of an original, and an electronic signature shall be deemed an original and valid signature. No change, consent or waiver to this Agreement will be effective unless in writing and signed by the Party against which enforcement is sought. The failure of either Party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights. Each right and remedy in this Agreement is in addition to any other right or remedy, at law or in equity, and the exercise of one right or remedy will not be deemed a waiver of any other right or remedy. If any provision of this Agreement is determined to be illegal or unenforceable, that provision will be limited or eliminated to the minimum extent necessary so that the Agreement shall otherwise remain in full force and effect and enforceable. This Agreement shall be governed by and construed in

accordance with the laws of the State of Delaware, without regard to conflict of laws provisions. In any action or proceeding to enforce this Agreement, the prevailing Party will be entitled to recover from the other Party its costs and expenses (including reasonable attorneys' fees) incurred in connection with such action or proceeding and enforcing any judgment or order obtained. Any notice hereunder will be effective upon receipt and shall be given in writing, in English and delivered to the other Party at its address given herein or at such other address designated by written notice.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as a sealed instrument, effective as of the Effective Date.

Fetch Rewards, LLC

Signature: ___________________________

Name: ______________________

Title: _______________________________

Date Signed:__________________________

Embedded Personnel

Signature: ___________________________

Name:_______________________

Date Signed:__________________________

# EXHIBIT E

(FILED UNDER SEAL)