**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SEQUEN AI, INC.,<br>*Plaintiff*,<br>v.<br>FETCH REWARDS LLC,<br>*Defendant*. | **REDACTED - PUBLIC VERSION**<br>(Filed August 20, 2026)<br>C.A. No: 26-731-MN<br>**JURY TRIAL DEMANDED** |

**DEFENDANT FETCH REWARDS LLC'S**
**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

Defendant Fetch Rewards LLC ("Fetch"), by and through its undersigned counsel, hereby submits this Answer, these Affirmative Defenses, and these Counterclaims in response to the Verified Complaint (the "Complaint") filed by Plaintiff Sequen AI, Inc. ("Sequen"). To the extent not specifically admitted herein, the allegations in the Complaint are denied in full. Fetch also denies any allegations that may be implied by or inferred from the headings of the Complaint.

## NATURE OF THE ACTION

1. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Complaint, and therefore denies the allegations. This paragraph also states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations of paragraph 1 of the Complaint.

2. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the Complaint, and therefore denies the allegations.

3. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 of the Complaint, and therefore denies the allegations.

4. Fetch admits that it is a consumer shopping rewards application and advertising platform servicing consumers and businesses, that it offers a digital-rewards application that allows consumers to earn points and redeem those points for gift cards, and that Fetch's Chief Executive Officer is Mr. Wes Schroll. Fetch further avers that it is a consumer shopping rewards application and advertising platform servicing consumers and businesses. Fetch denies the remaining allegations in paragraph 4 of the Complaint.

5. Fetch admits that, beginning in 2024, it became a customer of Sequen and subscriber to certain Sequen software services pursuant to various agreements. Fetch admits that a financial media outlet reported that Fetch "saw a 20% lift on net revenue in just under 11 days" with Sequen's services, and that Fetch's Chief Technology Officer, Mr. Ori Schnaps, was quoted in a media article as stating that Sequen "helped us unlock a substantial lift in conversions, showing us what's possible when a world-class internal team and the right external partner pull in the same direction." Fetch lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 5 of the Complaint, and therefore denies the allegations.

6. Fetch denies the allegations in paragraph 6 of the Complaint.

7. Fetch denies the allegations in paragraph 7 of the Complaint.

8. Fetch admits that Sequen's Chief Product Officer, Mr. Raphael Louca, was embedded to work at Fetch beginning in May 2026 pursuant to an Embedded Personnel Amendment to the parties' Master Services Agreement ("MSA"). Fetch denies the remaining allegations in paragraph 8 of the Complaint, including without limitation because Mr. Louca engaged in unlawful, bad faith conduct not authorized by the Embedded Personnel Amendment and in violation of the parties' agreements and federal and state law.

9. Fetch denies the allegations in paragraph 9 of the Complaint.

10. This paragraph states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 10 of the Complaint.

11. This paragraph states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 11 of the Complaint.

## THE PARTIES

12. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint, and therefore denies the allegations.

13. Fetch admits the allegations in paragraph 13 of the Complaint.

## JURISDICTION AND VENUE

14. This paragraph states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 14 of the Complaint.

15. Fetch refers to the MSA for its contents. The remainder of this paragraph states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 15 of the Complaint.

16. This paragraph states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 16 of the Complaint.

17. This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 17 of the Complaint.

## FACTUAL ALLEGATIONS

18. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Complaint, and therefore denies the allegations.

19. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Complaint, and therefore denies the allegations.

20. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint, and therefore denies the allegations.

21. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Complaint, and therefore denies the allegations.

22. Fetch admits that vendors exist to sell software-as-a-service, or "SaaS," and, for a fee, can connect to a client-company's internal software through Application Programming Interfaces, or "APIs," to provide customization and ranking models. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 22 of the Complaint, and therefore denies the allegations.

23. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 of the Complaint, and therefore denies the allegations.

24. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 of the Complaint, and therefore denies the allegations.

25. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 of the Complaint, and therefore denies the allegations.

26. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 of the Complaint, and therefore denies the allegations.

27. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 or Figure 1 of the Complaint, and therefore denies the allegations.

28. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 or Figure 1 of the Complaint, and therefore denies the allegations.

29. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 of the Complaint, and therefore denies the allegations.

30. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 of the Complaint, and therefore denies the allegations.

31. Fetch admits that Ms. Zoë Weil is the CEO of Sequen and Mr. Louca is the Chief Product Officer of Sequen. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 31 of the Complaint, including subparts (a) through (f) thereof, and therefore denies the remaining allegations.

32. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 of the Complaint, and therefore denies the allegations.

33. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 of the Complaint, and therefore denies the allegations.

34. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 of the Complaint, and therefore denies the allegations.

35. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35 of the Complaint, and therefore denies the allegations.

36. Fetch admits that it is a consumer shopping rewards application and advertising platform servicing consumers and businesses, that it was founded in 2013, and that it offers a digital-rewards application that allows consumers to earn points and redeem those points for gift cards. Fetch denies the remaining allegations in paragraph 36 of the Complaint.

37. Fetch admits that a mutual investor introduced Ms. Weil and Mr. Schroll to one another in 2024. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 37 of the Complaint, and therefore denies those allegations. Fetch denies the remaining allegations in paragraph 37 of the Complaint.

38. Fetch admits that Sequen and Fetch entered into the MSA and refers to the MSA for its contents. Fetch denies the remaining allegations in paragraph 38 of the Complaint.

39. Fetch refers to the MSA for its contents. Fetch denies the remaining allegations in paragraph 39 of the Complaint.

40. Fetch refers to the MSA for its contents. Fetch denies the remaining allegations in paragraph 40 of the Complaint.

41. Fetch refers to the MSA for its contents. Fetch denies the remaining allegations in paragraph 41 of the Complaint.

42. Fetch admits that Sequen and Fetch signed Service Order No. 1 on December 15, 2024, and refers to Service Order No. 1 for its contents. Fetch denies the remaining allegations in paragraph 42 of the Complaint.

43. Fetch refers to Service Order No. 1 for its contents. Fetch denies the remaining allegations in paragraph 43 of the Complaint.

44. Fetch admits that, after executing Service Order No. 1, the parties began working together pursuant to the parties' agreements. Fetch denies the remaining allegations in paragraph 44 of the Complaint.

45. Fetch admits that the parties conducted a series of live experiments, known as A/B tests, that compared ranking score outputs generated from Sequen's AI models against a control group. Fetch denies the remaining allegations in paragraph 45 of the Complaint.

46. Fetch denies the allegations in paragraph 46 of the Complaint.

47. Fetch denies the allegations in paragraph 47 of the Complaint.

48. Fetch denies the allegations in paragraph 48 of the Complaint.

49. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 49 of the Complaint concerning Sequen's and/or Ms. Weil's inferences and beliefs, and therefore denies the allegations. Fetch denies the remaining allegations in paragraph 49 of the Complaint.

50. Fetch admits that certain Fetch employees expressed enthusiasm about results observed during a sixth AI model experiment conducted between October and November 2025. Fetch denies the remaining allegations in paragraph 50 of the Complaint.

51. Fetch admits that, in early 2026, the parties discussed expanding their relationship, and that Mr. Schnaps participated in those discussions on behalf of Fetch. Fetch denies the remaining allegations in paragraph 51 of the Complaint.

52. Fetch admits that Sequen and Fetch entered into Service Order No. 2, effective April 1, 2026, and refers to Service Order No. 2 for its contents. Fetch denies the remaining allegations in paragraph 52 of the Complaint.

53. Fetch denies the allegations in paragraph 53 of the Complaint.

54. Fetch denies the allegations in paragraph 54 of the Complaint.

55. Fetch admits that pursuant to an Embedded Personnel Amendment to the MSA, Sequen's Chief Product Officer, Mr. Louca, was embedded to work at Fetch beginning in May 2026. Fetch denies the remaining allegations in paragraph 55 of the Complaint.

56. Fetch admits that Sequen and Fetch entered into the Embedded Personnel Amendment to the MSA, and refers to the Embedded Personnel Amendment for its contents. Fetch denies the remaining allegations of paragraph 56 of the Complaint.

57. Fetch admits that, at the end of May 2026, Fetch provided Mr. Louca with a Fetch-issued laptop and Slack credentials for purposes of the authorized scope of temporary

embedded work pursuant to the Embedded Personnel Amendment to the MSA, and that Mr. Louca subsequently accessed Fetch's Slack channels. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 57 of the Complaint that Mr. Louca used a Sequen-issued laptop for the alleged conduct, and therefore denies the allegations. Fetch denies the remaining allegations in paragraph 57 of the Complaint.

58. Fetch denies the allegations in paragraph 58 of the Complaint, including without limitation because Mr. Louca engaged in unlawful, bad faith conduct not authorized by the Embedded Personnel Amendment and in violation of the parties' agreements and federal and state law.

59. Fetch admits that it maintains technical infrastructure, including Kafka pipelines and Snowflake data tables. Fetch denies the remaining allegations in paragraph 59 of the Complaint, including without limitation its characterizations of any Fetch documentation, intentions, or conduct.

60. Fetch denies the allegations in paragraph 60 of the Complaint.

61. Fetch admits that Fetch engineer Ryan Tecco wrote the May 15, 2026 Slack message reflected at Exhibit E of the Complaint. Fetch denies the remaining allegations in paragraph 61 of the Complaint, including without limitation Sequen's characterization of Mr. Tecco's communications.

62. The last sentence of this paragraph contains legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in the last sentence of paragraph 62 of the Complaint. Fetch denies the remaining allegations in paragraph 62 of the Complaint, including without limitation Sequen's characterization of Mr. Tecco's communications.

63. Fetch denies the allegations in paragraph 63 of the Complaint.

64. This paragraph contains legal conclusions to which no response is required. Fetch denies the remaining allegations in paragraph 64 of the Complaint.

65. This paragraph contains legal conclusions to which no response is required. Fetch refers to the parties' agreements for their contents. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 65 of the Complaint, and therefore denies the remaining allegations.

66. This paragraph contains legal conclusions to which no response is required. Fetch refers to the parties' agreements for their contents.

67. This paragraph contains legal conclusions to which no response is required. Fetch refers to the parties' agreements for their contents.

68. This paragraph contains legal conclusions to which no response is required. Fetch refers to the parties' agreements for their contents.

69. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 69 of the Complaint, and therefore denies the allegations.

70. Fetch admits that Mr. Schroll, Ms. Weil, and the mutual investor attended a call on or about June 2, 2026, during which Mr. Schroll indicated that he would investigate the matters raised by Ms. Weil. Fetch further admits that, during this call, Ms. Weil demanded the termination of Fetch's Chief Technology Officer, Mr. Schnaps. Fetch also admits that Ms. Weil abruptly hung up. Fetch denies the remaining allegations in paragraph 70 of the Complaint, including any characterization of Fetch's conduct as willful, wanton, or knowing theft of Sequen's trade secrets.

71. Fetch admits that Mr. Schroll, Ms. Weil, and the mutual investor attended a second call on or about June 2, 2026, during which Mr. Schroll indicated that he would investigate the

matters raised by Ms. Weil and Ms. Weil shared certain screenshots that she represented had been taken by Mr. Louca. Fetch denies the remaining allegations in paragraph 71 of the Complaint, including without limitation any characterization that Fetch engaged in an extensive, ongoing plan to misappropriate Sequen's trade secrets.

72. Fetch denies the allegations in paragraph 72 of the Complaint, including without limitation any characterization that Mr. Schroll admitted to theft.

73. Fetch admits that Ms. Weil asked whether Sequen should terminate Fetch's access to Sequen's services. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the final sentence of paragraph 73 of the Complaint, and therefore denies the allegations. Fetch denies any remaining allegations contained in paragraph 73 of the Complaint.

74. Fetch admits that Ms. Weil transmitted certain materials concerning Sequen's allegations to Mr. Schroll following their call. Fetch denies the remaining allegations in paragraph 74 of the Complaint, including without limitation any characterization of those materials as evidence of wrongdoing.

75. Fetch admits that Ms. Weil sent Mr. Schroll text messages on June 3, 2026, and refers to those text messages for their contents. Fetch denies the remaining allegations in paragraph 75 of the Complaint, including without limitation any characterization of Fetch's conduct.

76. Fetch admits that Ms. Weil and Mr. Schroll exchanged text messages between June 2 and June 4, 2026, and refers to those messages for their contents.

77. Fetch admits that Ms. Weil sent Mr. Schroll text messages on June 4, 2026, and refers to those text messages for their contents.

78. Fetch admits that Ms. Weil and Mr. Schroll exchanged text messages between June 2 and June 4, 2026, and refers to those messages for their contents.

79. Fetch admits that Sequen's counsel sent Fetch a letter, dated June 5, 2026, and refers to that letter for its contents. Fetch denies the remaining allegations in paragraph 79 of the Complaint.

80. Fetch admits that its counsel sent Sequen's counsel a letter, dated June 10, 2026, and refers to that letter for its contents. Fetch denies the remaining allegations in paragraph 80 of the Complaint, including without limitation any characterization of the June 10 letter from Fetch's counsel.

81. Fetch denies the allegations in paragraph 81 of the Complaint.

82. Fetch admits that Sequen's counsel sent a letter, dated June 11, 2026, and refers to that letter for its contents. Fetch denies any remaining allegations in paragraph 82 of the Complaint.

83. Fetch admits that counsel for the parties held a telephone call on June 12, 2026, and refers to Fetch's counsel's email communications memorializing that call for their contents. Fetch denies the remaining allegations in paragraph 83 of the Complaint, including without limitation any characterization of statements made by Fetch's counsel during that call.

84. Fetch admits that its counsel sent Sequen's counsel an email, dated June 15, 2026, and refers to that email for its contents.

85. Fetch admits that Sequen's counsel sent correspondence to Fetch's counsel, dated June 17, 2026, and refers to that correspondence for its contents. Fetch denies any remaining allegations in paragraph 85 of the Complaint.

86. Fetch admits that its counsel sent Sequen's counsel an email, dated June 18, 2026, and refers to that email for its contents. Fetch denies the remaining allegations in paragraph 86 of the Complaint.

87. Fetch admits that its counsel sent Sequen's counsel an email, dated June 18, 2026, and refers to that email for its contents. Fetch denies the remaining allegations in paragraph 87 of the Complaint.

88. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 88 of the Complaint.

89. This paragraph contains legal conclusions to which no response is required. Fetch denies the remaining allegations in paragraph 89 of the Complaint.

90. Fetch admits that its counsel sent Sequen's counsel an email, dated June 18, 2026, and refers to that email for its contents. Fetch denies the remaining allegations in paragraph 90 of the Complaint.

91. Fetch denies the allegations in paragraph 91 of the Complaint.

92. This paragraph contains characterizations, legal contentions, and conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 92 of the Complaint.

93. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 93 of the Complaint.

94. This paragraph contains characterizations, legal contentions, and conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 94 of the Complaint.

95. This paragraph contains characterizations, legal contentions, and conclusions to which no response is required. To the extent a response is required, Fetch refers to the MSA for its contents, and denies the remaining allegations in paragraph 95 of the Complaint.

**COUNT I**

*Misappropriation of Trade Secrets*
*Under the Defend Trade Secrets Act ("DTSA")*
(18 U.S.C. § 1836 *et seq*.)

96. Fetch incorporates by reference its responses to paragraphs 1 through 95 above as if fully set forth herein.

97. Paragraph 97 states a legal conclusion to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 97 of the Complaint.

98. Paragraph 98 states legal conclusions to which no response is required. Fetch lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 98 of the Complaint, and therefore denies the remaining allegations.

99. Paragraph 99 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 99 of the Complaint.

100. Paragraph 100 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 100 of the Complaint.

101. Paragraph 101 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 101 of the Complaint.

102. Paragraph 102 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 102 of the Complaint.

103. Paragraph 103 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 103 of the Complaint.

104. Paragraph 104 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 104 of the Complaint.

**COUNT II**

*Breach of Contract Under Delaware Law*

105. Fetch incorporates by reference its responses to paragraphs 1 through 104 above as if fully set forth herein.

106. Paragraph 106 states legal conclusions to which no response is required. To the extent a response is required, Fetch admits that the MSA and the incorporated Service Orders constitute valid and enforceable contracts. Fetch denies the remaining allegations in paragraph 106 of the Complaint.

107. Paragraph 107 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 107 of the Complaint.

108. Paragraph 108 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 108 of the Complaint.

109. Paragraph 109 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 109 of the Complaint.

**COUNT III**

*Misappropriation of Trade Secrets*
*Under the Delaware Uniform Trade Secrets Act ("DUTSA")*
(6 Del. C. § 2001 *et seq*.)

110. Fetch incorporates by reference its responses to paragraphs 1 through 109 above as if fully set forth herein.

111. Paragraph 111 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 111 of the Complaint.

112. Paragraph 112 states legal conclusions to which no response is required. To the extent a response is required, Fetch lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 112 of the Complaint, and therefore denies the allegations.

113. Paragraph 113 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 113 of the Complaint.

114. Paragraph 114 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 114 of the Complaint.

115. Paragraph 115 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 115 of the Complaint.

116. Paragraph 116 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 116 of the Complaint.

117. Paragraph 117 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 117 of the Complaint.

118. Paragraph 118 states legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 118 of the Complaint.

## **COUNT IV**

*Unjust Enrichment*

119. Fetch incorporates by reference its responses to paragraphs 1 through 118 above as if fully set forth herein.

120. Fetch denies the allegations in paragraph 120 of the Complaint.

121. Paragraph 121 contains legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 121 of the Complaint.

122. Paragraph 122 contains legal conclusions to which no response is required. To the extent a response is required, Fetch denies the allegations in paragraph 122 of the Complaint.

## PRAYER FOR RELIEF

Fetch denies that Sequen is entitled to any of the relief requested in Sequen's Prayer for Relief, including subparagraphs 1 through 11 thereof, or to any relief whatsoever.

## AFFIRMATIVE DEFENSES

Fetch asserts the following affirmative defenses without assuming the burden of proof on any such defense that would otherwise rest with Sequen. Fetch reserves the right to amend, supplement, or withdraw any defense as discovery and further investigation warrant.

## FIRST AFFIRMATIVE DEFENSE

Sequen's claims for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"), and the Delaware Uniform Trade Secrets Act, 6 *Del. C.* § 2001 *et seq.* ("DUTSA"), fail to state a claim upon which relief can be granted. A plaintiff asserting misappropriation must plausibly allege the existence of a protectable trade secret, its relation to a product or service used in interstate commerce, and misappropriation of that trade secret by improper means. Sequen's Complaint fails to identify its purported trade secrets with the particularity required to state a claim, offering only generic descriptions, which is insufficient to plead a protectable trade secret. Moreover, the Sequen-generated ranking score outputs were contractually delivered to Fetch for Fetch's use, their entire purpose was their disclosure to Fetch, rather than their concealment from Fetch, and Sequen has admitted that Fetch never accessed Sequen's underlying models, source code, algorithms, or training data. Fetch received the Sequen-generated ranking score outputs at issue lawfully and pursuant to the parties' agreements, not through theft, bribery, misrepresentation, or any other improper means. Benchmarking those

outputs against Fetch's own independently developed models is not reverse engineering and does not constitute misappropriation.

## SECOND AFFIRMATIVE DEFENSE

Sequen's claim for breach of contract fails to state a claim upon which relief can be granted. A plaintiff asserting breach of contract under Delaware law must plausibly allege the existence of a contract, breach of an obligation imposed by that contract, and resulting damages. The conduct Sequen challenges—benchmarking exercises conducted in part with logging Sequen-generated ranking score outputs to compare against Fetch's independently developed models—is expressly authorized by Section 2(d) of the MSA, which permits Fetch to continue developing similar services so long as that development does not infringe Sequen's intellectual property rights, misappropriate Sequen's trade secrets, or breach Fetch's confidentiality obligations. Fetch did not copy, modify, or reverse engineer any software component of Sequen's Services (as defined in the parties' agreements), and access to the benchmarking data was limited to the Fetch engineers performing that authorized work. No section of the MSA prohibits this activity.

Further, Sequen has not plausibly alleged resulting damages, an essential element of a breach of contract claim under Delaware law. Sequen's Complaint identifies no lost customer, lost revenue, competing product launch, or other concrete injury flowing from Fetch's alleged conduct, and instead rests on speculation about what Fetch's engineers might someday recall or apply. Speculative or unrealized harm cannot supply the damages element required to state a claim for breach of contract.

## THIRD AFFIRMATIVE DEFENSE

Sequen's claim for unjust enrichment fails because it is superfluous to Sequen's claim for breach of contract and not pleaded in the alternative, and because the claim is preempted and barred by the DUTSA. Unjust enrichment is a quasi-contract theory of recovery to remedy the absence

of a formal contract. However, Sequen and Fetch do not dispute the existence of the MSA, Service Order Nos. 1 and 2, and the Embedded Personnel Amendment. Where, as here, a valid and enforceable contract exists, unjust enrichment is not available to Sequen; and, to the extent Sequen could have pleaded unjust enrichment in the alternative to breach of contract, Sequen has failed to do so. Moreover, the DUTSA preempts common law claims for recovery of damages stemming from the same underlying alleged conduct. Because Sequen bases its unjust enrichment claim on the same alleged benchmarking exercises and theories of resulting harm as it does its DUTSA claim, the unjust enrichment claim is preempted.

**FOURTH AFFIRMATIVE DEFENSE**

Sequen's claims for equitable relief are barred, in whole or in part, by the doctrine of unclean hands. A party seeking equitable relief that is itself guilty of conduct involving fraud, deceit, unconscionability, or bad faith directly related to the matter in issue, and that injures the other party, may not obtain that relief where its own misconduct affects the balance of equities between the litigants. Sequen deployed its Chief Product Officer, Mr. Raphael Louca, inside Fetch's systems under the guise of troubleshooting underperforming services. Rather than confining his access to that limited assignment, Mr. Louca systematically surveilled numerous Fetch Slack channels having no connection to his assignment, including a channel involving a Sequen competitor, screenshotted confidential internal Fetch communications, and transmitted them to Sequen's leadership, who then used those materials as the basis for this action. On information and belief, when Sequen's Chief Executive Officer, Ms. Zoë Weil, received these illicitly obtained screenshots from Mr. Louca, she expressly instructed him to continue to engage in his surveillance of Fetch's confidential systems and, despite being informed by Sequen's counsel that this course of conduct was problematic, later opined to Fetch's Chief Executive Officer, Mr. Wes Schroll, that she did not care. During that same conversation, and in reliance on

Mr. Louca's illicitly obtained screenshots, Ms. Weil then extortionately demanded from Mr. Schroll the immediate termination of five Fetch employees, payment of [redacted] per year to Sequen in perpetuity, and a commitment that Fetch would use Sequen for all future ranking services, also in perpetuity. This conduct bears an immediate and necessary relation to the claims Sequen now asserts and bars the equitable relief Sequen seeks.

**FIFTH AFFIRMATIVE DEFENSE**

Sequen's claim for breach of contract is barred, in whole or in part, by Sequen's own repudiation of the MSA and Service Order No. 2. Section 3(a) of the MSA required Sequen to make the services available to Fetch in accordance with the service levels set out in the applicable Service Order for the duration of the Order Term. Service Order No. 2 established a subscription term running through March 31, 2027. Notwithstanding its contractual obligations, on or about June 4, 2026, Sequen unilaterally suspended services to Fetch. Sequen's actions, which were taken without providing Fetch any written notice as required under Section 10(b) of the MSA, constituted a material breach thereof. Sequen's abrupt cessation of performance constituted an unequivocal manifestation of Sequen's intent not to perform its obligations under the MSA and a material breach of Sequen's own contractual obligations. Sequen's conduct excused any further performance owed by Fetch and bars, in whole or in part, Sequen's claims for breach of contract and the relief sought in the Complaint.

**SIXTH AFFIRMATIVE DEFENSE**

Sequen's claims for damages are barred or reduced, in whole or in part, by Sequen's failure to mitigate its damages and the limitations of liability and damages cap under Section 9 of the MSA. Sequen has identified no lost customers, lost revenue, or competing product launch resulting from Fetch's alleged conduct, and Sequen unilaterally suspended the services to Fetch on or about June 4, 2026, without prior notice, while separately rejecting Fetch's sworn

certification and remedial offers. Sequen's own conduct in refusing available remedial measures and voluntarily discontinuing performance under the parties' agreements bars or reduces any recovery it might otherwise seek. Further, Section 9 of the MSA provides that neither party will be liable under any legal or equitable theory, including breach of contract, tort (including negligence), strict liability, and otherwise, for any consequential, incidental, indirect, exemplary, special, enhanced, or punitive damages, regardless of whether either party was advised of the possibility of such losses or damages or such losses or damages were otherwise foreseeable. Section 9 also provides that the aggregate liability of either party for the foregoing will not exceed one (1) times the total amounts paid and amounts accrued but not yet paid to Sequen under the MSA in the one (1)-year period preceding the event(s) giving rise to Sequen's claim(s). To the extent that Sequen purports to seek any of the foregoing damages or aggregate liability of Fetch in excess of the amounts Fetch paid or that accrued during the one-year period up to and including June 5, 2026 (the date that Sequen's counsel first wrote Fetch alleging the conduct that is the subject matter of the Verified Complaint), the MSA bars Sequen from doing so.

**SEVENTH AFFIRMATIVE DEFENSE**

Sequen's claims are barred, in whole or in part, by the doctrines of waiver and estoppel. Before the parties executed the MSA, Fetch's then-Chief Technology Officer, Mr. Wade Bruce, disclosed to Sequen's Chief Executive Officer, Ms. Weil, that Fetch intended to continue developing its own internal ranking models alongside its use of Sequen's services, explaining that this approach was a core part of Fetch's strategy. With that mutual understanding in place, the parties negotiated and agreed to Section 2(d) of the MSA, which expressly preserves Fetch's right to develop competing offerings. Having accepted Fetch's business with knowledge that Fetch intended to develop and measure its own models against Sequen's, and having negotiated a contract provision expressly memorializing that understanding, Sequen waived, and is now

estopped from asserting, any claim premised on Fetch's benchmarking of its independently developed models.

## EIGHTH AFFIRMATIVE DEFENSE

Sequen's claims are barred, in whole or in part, because Fetch was authorized pursuant to the license under the MSA and Service Order Nos. 1 and 2 to receive and use the Sequen-generated ranking score outputs delivered to Fetch by API, and to continue developing Fetch's competing offerings pursuant to Section 2(d) of the MSA. Accordingly, Fetch's alleged conduct does not constitute "improper means" of obtaining the Sequen-generated outputs, notwithstanding that they are not protectable trade secrets, thus defeating Sequen's claims under the DTSA and the DUTSA, and for breach of contract and unjust enrichment.

## NINTH AFFIRMATIVE DEFENSE

Sequen's claims for misappropriation of trade secrets under the DTSA and the DUTSA are barred, in whole or in part, to the extent that Sequen alleges that Fetch did use or could have used the Sequen-generated ranking score outputs to engage in "reverse engineering" of Sequen's AI ranking and retrieval models, algorithmic logic, source code, or back-end systems. Fetch did not reverse engineer any Sequen data or models, but even had it done so, reverse engineering is explicitly carved out of the DTSA as a means of misappropriation, 18 U.S.C. § 1839(6)(B), and Delaware law likewise treats reverse engineering as a defense to claims for trade secret misappropriation.

## PRAYER FOR RELIEF

WHEREFORE, Fetch respectfully requests that the Court enter judgment in its favor and against Sequen and grant Fetch the following relief:

(a) Dismiss the Complaint in its entirety, with prejudice;

(b) Deny each and every form of relief Sequen requests in the Complaint;

(c) Award Fetch its costs and reasonable attorneys' fees incurred in defending this action, to the extent permitted by law or contract; and

(d) Grant Fetch such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

Counterclaimant Fetch Rewards LLC ("Fetch"), for its Counterclaims against Sequen AI, Inc. ("Sequen"), alleges as follows:

## THE PARTIES

1. Fetch is a limited liability company organized under the laws of the State of Delaware, with its headquarters located at 1050 East Washington Avenue, Madison, WI 53703.

2. Sequen is a business corporation organized under the laws of the State of Delaware, having its headquarters and principal place of business at 29-22 Northern Boulevard, Long Island City, New York, NY 11101.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction over Fetch's counterclaims pursuant to 28 U.S.C. § 1367(a), because those counterclaims are so related to the claims in this action that they form part of the same case or controversy.

4. Jurisdiction and venue are proper in this Court pursuant to Section 11(e) of the MSA, in which Sequen and Fetch agreed that any disputes relating to the parties' contracts must be brought in Delaware state or federal courts, and that they would submit to the exclusive jurisdiction of the State of Delaware.

5. This Court also has personal jurisdiction over Sequen because Sequen is a citizen of the State of Delaware, and Sequen submitted to the jurisdiction of this Court by filing the Complaint in this action.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and Section 11(e) of the MSA.

## FACTUAL BACKGROUND

### Fetch Is a Successful Company with Independent AI Development Programs.

7. Fetch is a consumer shopping rewards application and advertising platform servicing both consumers and businesses. CEO Wes Schroll founded the Company in 2013 while at the University of Wisconsin-Madison. Fetch has grown to over 12 million unique users, $500 million in annualized revenues, and a valuation exceeding $2.2 billion.

8. Shoppers use Fetch to sync e-commerce accounts, upload receipts, and earn rewards. Businesses work with Fetch to gain insights from data analytics about who their customer base is, and what, when, and where those customers buy products or services, allowing businesses to tailor their commercial offerings.

9. To enhance its own services, Fetch has been developing AI-powered ranking and personalization tools that predate its relationship with Sequen.

### Fetch Executes a Licensing Agreement with Sequen.

10. While developing its own AI-powered ranking and personalization models, Fetch pursued engagements with third-party vendors like Sequen. In 2024, a mutual investor introduced Mr. Schroll to Zoë Weil, Sequen's CEO. Sequen offered AI-powered ranking services to help determine the order in which individualized Fetch offers, content, or games would appear to Fetch users.

11. On December 15, 2024, Fetch and Sequen entered into a Master Service Agreement (the "MSA" and, together with Service Order Nos. 1 and 2, the "Agreements"), pursuant to which: (i) Fetch fed Sequen its user data; (ii) Sequen ran the data through its AI models; and (iii) Sequen sent Fetch raw ranking scores to prioritize content for Fetch users. *See* Compl., Exs. A-C.

12. Critically, before entering the Agreements, Fetch was transparent with Sequen about its intention to continue developing its own AI models. Wade Bruce, Fetch's then-Chief Technology Officer, communicated directly with Ms. Weil on November 21, 2024, about Fetch's ongoing internal AI model development. Mr. Bruce explained to Ms. Weil that Fetch's desire to maintain the right to develop its own internal models was not "a reflection on [Sequen] but rather a core part of [Fetch's] strategy." Ex. 1 (appended hereto). Because user experience personalization is paramount to Fetch's business model, Mr. Bruce further explained to Ms. Weil that Fetch "can't put all [its] eggs in one third-party basket." *Id.* Accordingly, Fetch communicated that it wanted to continue "working with [Sequen] alongside building [Fetch's] own" AI model. *Id.* Mr. Bruce made abundantly clear that, whether with respect to Sequen's AI models or Fetch's, "[t]he approach will be the same across the board: deploy, measure, iterate, and repeat. The most impactful product will win." *Id.*

13. With this mutual understanding in place, the parties negotiated an independent development provision in the MSA that expressly preserves Fetch's ability to develop its own ranking-output models, stating that Fetch "shall not [be] preclude[d] . . . from independently developing or supporting competing offerings," provided Fetch does not infringe Sequen's intellectual property rights, misappropriate Sequen's trade secrets, or breach the MSA's confidentiality obligations. Compl., Ex. A § 2(d).

**<u>Sequen Embeds a Consultant at Fetch for Unlawful Corporate Espionage.</u>**

14. In May 2026, Fetch and Sequen were working to deploy and configure additional Sequen services. But because the services were underperforming, Sequen proposed that its Chief Product Officer, Raphael Louca, temporarily work at Fetch to assist. The parties separately memorialized Mr. Louca's temporary work through the Embedded Personnel Amendment to the

MSA, and, at all times, the parties understood that Mr. Louca remained a Sequen employee and that his access to Fetch systems was provided solely to support Sequen-related deployment and configuration work.

15. At the end of May 2026, Fetch provided Mr. Louca with Fetch credentials and a Fetch-issued laptop for that temporary embedded work. Per the parties' Embedded Personnel Amendment, Mr. Louca's authorization was narrow: to analyze issues with Sequen's underperforming services.

16. Yet, Mr. Louca subsequently used Slack to gain unauthorized access to Fetch's internal channels and communications outside the scope of his temporary assignment. Shortly after joining Fetch's Slack workspace, Mr. Louca surveilled numerous internal Fetch Slack channels and other Fetch data with no conceivable connection to analysis of Sequen's services. Among other things, Mr. Louca:

a) investigated Fetch's internal conversations, documentation, and positioning regarding Fetch's independent model development efforts and personalization strategy, which Mr. Louca screenshotted and transmitted to Sequen's leadership;

b) accessed a Slack channel that Fetch shared with a third-party company ("Company A") that provides personalization services in direct competition with Sequen's offerings, through which Mr. Louca viewed the non-disclosure agreement and master service agreement between Fetch and Company A, a file containing the proprietary data output of Company A's personalization service, and ongoing performance discussions and integration details between Company A and Fetch;

c) reviewed documentation concerning Fetch's relationship with a third-party partner that assists Fetch in providing its "Play" product; and

d) accessed other internal, sensitive Fetch information without authorization or cause, including Fetch's internal source code repositories on GitHub, Fetch's internal databases in Snowflake, and employee-only resources such as recordings of internal "town hall" meetings and employment benefits guides.

17. By Sequen's own admission, Mr. Louca screenshotted at least a sub-set of these confidential Fetch materials, upon which Sequen now relies in this litigation.

18. On information and belief, Sequen entered into the Embedded Personnel Amendment to the MSA on false pretenses as the basis for Mr. Louca to engage in his illicit surveillance of Fetch's internal systems.

**<u>Sequen Ambushes Fetch with Unfounded Accusations of Theft.</u>**

19. Late at night on June 2, 2026, Ms. Weil contacted Mr. Schroll and a Director on Fetch's Board of Directors—the mutual investor who had introduced Ms. Weil and Mr. Schroll in 2024—requesting an "urgent" discussion about a "very serious issue . . . that came to [her] attention in the past 24 hours." Ex. 2. Shortly thereafter, the Director called Mr. Schroll and referenced screenshots of internal Fetch communications taken by Mr. Louca and in Ms. Weil's possession, as well as accusations by Ms. Weil that Fetch had committed theft.

20. These accusations took Mr. Schroll by surprise; at that point, he knew only that Mr. Louca had recently been provided Fetch credentials and a Fetch-issued laptop for his temporary embedded work.

21. Later that night, the Director called Mr. Schroll again, by FaceTime, and added Ms. Weil to the call. Without any opportunity to meaningfully review Sequen's accusations, Mr. Schroll mainly listened during the seven-minute call, during which Ms. Weil stated that she had heard that Mr. Schroll had spoken to the Director and that Mr. Schroll had agreed that Fetch was in breach of the MSA and would "make it up" to Sequen. However, Mr. Schroll had stated no such thing, and told Ms. Weil that while he trusted her, he still needed to investigate and confer with members of his team. Ms. Weil became upset and abruptly hung up the call.

22. The Director then called Mr. Schroll again and merged Ms. Weil into the call. During the second call, Ms. Weil stated that because Fetch's "dumbass IT person" gave Mr. Louca unrestricted access to Fetch's Slack channels, she possessed screenshots from Mr. Louca demonstrating Fetch had been intentionally stealing Sequen's intellectual property. Ms. Weil mentioned that her lawyers had told her that Sequen should not have taken these screenshots of Fetch's internal communications and that it was troubling and problematic that she possessed them, but that she did not care. She further stated that, after Mr. Louca sent them to her, she instructed him to keep spying on Fetch's systems for additional information.

23. Ms. Weil then shared some of the screenshots on her screen of what appeared to be internal messages at Fetch sent by a Fetch engineer concerning Sequen AI model output logging.

24. Ms. Weil demanded the immediate termination of five Fetch employees, payment of [redacted] per year to Sequen in perpetuity, and a commitment that Fetch would use Sequen for all future ranking services in perpetuity. Mr. Schroll asked whether Ms. Weil intended to blackmail Fetch with these demands.

25. To de-escalate tension, Mr. Schroll stated that he would investigate Ms. Weil's claims.

26. On June 3 and 4, 2026, Ms. Weil messaged Mr. Schroll requesting a "status update" on Fetch's "ongoing review" and offering her help to "root this issue out." Ex. 3.

27. On or around June 11, 2026, while the parties' counsel exchanged letters about the dispute underlying this litigation, Ms. Weil sent Mr. Schroll a barrage of texts with *ad hominem* invective: "[W]es, since your tiny little fucking brain doesn't seem to get it you dumb fuck, . . . you're a fucking thief. . . . You fucking moron. . . . what the fuck is wrong with you? You're a serial fucking thief with a LOT of paper trail," a "provable serial liar as is your dumb fucking team" of "liars, cheaters, and thieves" and, to conclude, a "shameless piece of shit." Ex. 4. Mr. Schroll did not respond.

**<u>Fetch Investigates and Provides Assurances to Sequen, Which Sequen Rejects.</u>**

28. On June 5, 2026, Sequen sent a letter demanding that Fetch halt development of any AI model informed by Sequen's services, sequester devices, terminate employees, and submit to a third-party forensic audit. *See* Ex. 5.

29. Sequen also unilaterally stopped providing services to Fetch on June 4, 2026, without warning or notice, damaging Fetch's ability to do business and forcing Fetch to scramble to rebuild personalization functionality, which required removing Sequen's live integration into Fetch's systems.

30. Fetch responded on June 10 and 18, 2026, confirming that its team had logged Sequen-generated ranking scores as part of routine vendor assessment and industry-standard benchmarking in an offline environment. Fetch confirmed it had not updated any production model, deployed a competing system, or fed Sequen's outputs into a training pipeline. On June 16, Fetch removed all Sequen scores from live systems and retained backups.

31. Fetch's investigation further confirmed that: (a) Fetch did not use Sequen's outputs to train any AI models; (b) Fetch did not feed Sequen's outputs into any model training pipeline; (c) Fetch did not modify any deployed model based on Sequen's outputs; (d) Fetch did not reverse engineer Sequen's AI model architecture, algorithms, or source code; (e) Fetch did not share Sequen's outputs with any third party; and (f) Fetch's proprietary models were not updated based on the benchmarking exercise. Despite Fetch offering a sworn certification of the foregoing, Sequen rejected Fetch's offer and instead filed this litigation.

## **COUNT I**

*Breach of Contract*
(Termination of the MSA and Service Order No. 2)

32. Fetch repeats and incorporates by reference the preceding paragraphs 1 through 31 of its Counterclaims as though fully set forth herein.

33. The MSA and Service Order No. 2 constitute valid and enforceable contracts between Fetch and Sequen.

34. Section 3(a) of the MSA required Sequen to make the services available to Fetch in accordance with the service levels set out in the applicable Service Order for the duration of the Order Term. Service Order No. 2 established a subscription term running through March 31, 2027.

35. Section 10(b)(i) of the MSA required Sequen to provide Fetch with written notice of any alleged material breach and, where the breach was capable of cure, a thirty-day period to cure that breach before termination could become effective.

36. On or about June 4, 2026, without providing Fetch any written notice of breach or opportunity to cure, Sequen unilaterally cut off Fetch's access to the services in material breach and repudiation of the MSA and Service Order No. 2. This damaged Fetch's ability to do business and forced Fetch to scramble to rebuild personalization functionality, which required removing

Sequen's live integration into Fetch's systems. Fetch has not since received any services because, even if they were restored by Sequen, Fetch would have to rebuild the integration system that it was forced to dismantle upon Sequen's breach.

37. As a direct and proximate result of Sequen's breach, Fetch has suffered damages in an amount to be determined at trial, including, but not limited to, the loss of the services for which Fetch had already paid substantial license and infrastructure fees.

**COUNT II**

*Breach of Contract*
(MSA and Embedded Personnel Amendment)

38. Fetch repeats and incorporates by reference the preceding paragraphs 1 through 37 of its Counterclaims as though fully set forth herein.

39. The MSA, as amended by the Embedded Personnel Amendment, constitutes a valid and enforceable contract between Fetch and Sequen.

40. Section 5 of the MSA imposed express confidentiality obligations on Sequen, and Section 2(c) of the MSA prohibited Sequen and its personnel from attempting to derive or gain unauthorized access to Fetch's systems. The Embedded Personnel Amendment further limited Mr. Louca's access to Fetch's systems to the scope necessary to analyze issues with Sequen's underperforming services, and separately required Sequen to ensure that Mr. Louca executed a non-disclosure agreement directly with Fetch before Fetch provided Mr. Louca with any access to Fetch's systems. *See* Compl., Ex. D §§ 1.2, 1.5, 2.1, 3.1, 7.1-7.2. The Embedded Personnel Amendment also required Sequen to ensure that Mr. Louca complied with the terms of his non-disclosure agreement, Fetch's then-current internal policies (including on acceptable use, information security, data handling, code of conduct), and all applicable laws and regulations in connection with Mr. Louca's access to and use of Fetch's systems. Compl., Ex. D § 4.1. Sequen

was also required to promptly notify Fetch in writing upon becoming aware of any actual or suspected unauthorized access to, or misuse of, Fetch's systems by Mr. Louca, and any actual or suspected breach of an NDA or Fetch policy by Mr. Louca; to cooperate fully with Fetch in connection with any investigation of potential misuse of Fetch's systems or breach of the Embedded Personnel Amendment by Mr. Louca; and to implement and maintain reasonable internal controls to prevent unauthorized disclosure of Fetch's Confidential Information. *Id.* §§ 4.2, 4.4, 7.2.

41. Sequen breached all of these provisions. At the end of May 2026, Fetch provided Mr. Louca with a Fetch-issued laptop and Slack credentials solely for purposes of his limited, authorized assignment to analyze issues with Sequen's underperforming services. But by Sequen's own admission, Sequen failed to ensure that Mr. Louca executed the required non-disclosure agreement with Fetch before Fetch granted Mr. Louca access to Fetch's systems. Worse still, Mr. Louca never undertook his authorized assignment. Instead, between June 1 and 2, 2026, Mr. Louca used his access to Fetch's systems to systematically surveil numerous internal Fetch Slack channels with no credible connection to his assignment, including a channel involving communications with Company A, a Sequen competitor. On information and belief, Mr. Louca also accessed documents and took screenshots using a non-Fetch-issued device of confidential and sensitive internal Fetch communications, documents, and other work product that Mr. Louca then sent to Sequen executives, including Chief Executive Officer Ms. Weil. All of Mr. Louca's conduct was in breach of the MSA and Embedded Personnel Amendment.

42. Instead of informing Fetch in writing of these breaches of the MSA, Embedded Personnel Amendment, and Fetch's policies, and instead of cooperating with Fetch's investigation of those breaches, Sequen endorsed Mr. Louca's misconduct and encouraged it. In fact, during a

conversation on or about June 2, 2026, Sequen CEO Ms. Weil told Fetch's CEO Mr. Schroll that she instructed Mr. Louca to continue to surveil Fetch's systems in further breach of the MSA and Embedded Personnel Amendment.

43. On information and belief, Sequen's counsel acknowledged that Mr. Louca's conduct was troubling and problematic. This did not deter Ms. Weil from directing Mr. Louca to continue to engage in his misconduct and breaches of the parties' agreements.

44. As a direct and proximate result of Sequen's breaches, Fetch has suffered damages in an amount to be determined at trial, including, but not limited to, the compromise of the confidentiality of its third-party and internal business communications.

## COUNT III

*Breach of the Implied Covenant of Good Faith and Fair Dealing*

45. Fetch repeats and incorporates by reference the preceding paragraphs 1 through 44 of its Counterclaims as though fully set forth herein.

46. The MSA contains an implied covenant of good faith and fair dealing under Delaware law.

47. On or about June 4, 2026, Sequen unilaterally suspended its services to Fetch without prior written notice, thereby frustrating the fundamental purpose of the MSA and defeating the parties' reasonable contractual expectations, in breach of the implied covenant of good faith and fair dealing.

48. As a direct and proximate result of Sequen's breach of the implied covenant of good faith and fair dealing, Fetch has suffered damages in an amount to be determined at trial.

**COUNT IV**

*Breach of Confidence*

49. Fetch repeats and incorporates by reference the preceding paragraphs 1 through 48 of its Counterclaims as though fully set forth herein.

50. Fetch and Sequen shared a confidential relationship. That confidential relationship arose from the Embedded Personnel Amendment, which required Sequen to "ensure that Embedded Personnel are bound by confidentiality obligations no less protective of Fetch's interests than those set forth in the Agreement" and to "implement and maintain reasonable internal controls to prevent unauthorized disclosure" of Fetch's confidential information (Compl., Ex. D §§ 7.1-7.2); and that "[e]ach Embedded Personnel member must execute an NDA directly with Fetch before access to any Fetch Systems is provisioned," with Sequen "responsible for ensuring that Embedded Personnel comply with . . . the terms of the NDAs" (*id.* §§ 3.1, 4.1). Fetch also had a reasonable commercial expectation that an embedded vendor representative would respect the confidentiality of Fetch's internal systems and communications. Sequen failed to ensure that Mr. Louca executed the required non-disclosure agreement with Fetch before he was granted access to Fetch's systems, and failed to implement adequate internal controls to prevent Mr. Louca's unauthorized disclosure of Fetch's confidential communications, in further breach of the Embedded Personnel Amendment.

51. Sequen, through Mr. Louca, accessed Fetch's internal Slack channels far beyond the scope of his authorized assignment.

52. Mr. Louca screenshotted confidential internal Fetch communications and transmitted them to Sequen's leadership without Fetch's authorization or knowledge.

53. On information and belief, Ms. Weil, upon receipt of Mr. Louca's screenshots, instructed him to continue to surveil Fetch's systems and gather additional, unauthorized access and/or knowledge of Fetch's confidential information, without Fetch's authorization or awareness.

54. Sequen's unauthorized use and disclosure of Fetch's confidential communications has caused Fetch harm, including, but not limited to, reputational harm and the compromise of the confidentiality of its third-party and internal business operations and strategy.

55. Fetch is entitled to damages, and to such other and further relief as the Court deems just and proper, for Sequen's breach of confidence.

**COUNT V**

*Unjust Enrichment*
(Pled in the Alternative)

56. Fetch repeats and incorporates by reference the preceding paragraphs 1 through 55 of its Counterclaims as though fully set forth herein.

57. Sequen, through Mr. Louca, obtained unauthorized access to Fetch's confidential internal communications and materials, including a Slack channel involving a Sequen competitor.

58. Sequen was enriched by that unauthorized access and by the competitive intelligence it derived from Fetch's confidential communications, while Fetch continued to pay Sequen substantial fees, including an invoice of [redacted] for the month of June 2026, during the same period Sequen was surveilling Fetch's systems.

59. It would be inequitable for Sequen to retain the benefit of that unauthorized access and the fees Fetch paid during the period of Sequen's misconduct.

60. Fetch is entitled to restitution and disgorgement of the benefit Sequen obtained, in an amount to be determined at trial.

**COUNT VI**

*Unfair Competition*

61. Fetch repeats and incorporates by reference the preceding paragraphs 1 through 60 of its Counterclaims as though fully set forth herein.

62. Fetch has a reasonable expectation of completing and deploying its own independently developed ranking models, a right the MSA expressly preserves under Section 2(d) thereof.

63. Sequen knew of and agreed to Fetch's independent development efforts from the outset of the parties' relationship, including through the pre-contractual discussions between Fetch's then-Chief Technology Officer, Mr. Bruce, and Sequen's Chief Executive Officer, Ms. Weil.

64. Sequen nonetheless deployed Mr. Louca to surveil Fetch's internal development efforts under the guise of a limited troubleshooting assignment, and has used the fruits of that surveillance to pursue this litigation and an injunction that would halt Fetch's independent model development and bar Fetch's engineers from their work.

65. Sequen's conduct constitutes wrongful interference with Fetch's reasonable expectation of completing and deploying its own competing ranking models.

66. As a direct and proximate result of Sequen's wrongful interference, Fetch has suffered and will continue to suffer harm, including disruption to its independent development efforts, in an amount to be determined at trial.

## **COUNT VII**

*Violation of the Delaware Computer Crime Statute*
(11 Del. C. §§ 932, 941)

67. Fetch repeats and incorporates by reference the preceding paragraphs 1 through 66 of its Counterclaims as though fully set forth herein.

68. Fetch's internal Slack workspace and associated systems constitute a computer system within the meaning of 11 Del. C. § 931.

69. Mr. Louca accessed Fetch's Slack channels, including a channel involving a Sequen competitor, that fell outside the scope of the access Fetch authorized under the Embedded Personnel Amendment.

70. Mr. Louca's unauthorized access caused injury to Fetch's business, including the compromise of confidential third-party and internal communications and the resulting harm to Fetch's business relationships and reputation.

71. Fetch is entitled to damages under 11 Del. C. § 941 for Sequen's violation of the Delaware Computer Crime Statute, in an amount to be determined at trial.

## **COUNT VIII**

*Violation of the Computer Fraud and Abuse Act*
(18 U.S.C. § 1030)

72. Fetch repeats and incorporates by reference the preceding paragraphs 1 through 71 of its Counterclaims as though fully set forth herein.

73. Fetch's internal Slack workspace and associated systems constitute a protected computer within the meaning of 18 U.S.C. § 1030(e)(2).

74. Mr. Louca accessed Fetch's Slack channels, including a channel involving a Sequen competitor, that fell outside the scope of the access Fetch authorized under the Embedded Personnel Amendment.

75. Mr. Louca's unauthorized access caused Fetch to incur a loss, including without limitation damage to Fetch's business relationship with Sequen and the cost of Fetch's forensic investigation, in an amount exceeding $5,000 during a one-year period, in violation of 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), (e)(11), and (g).

76. Fetch is entitled to damages and equitable relief under 18 U.S.C. § 1030(g) for Sequen's violation of the Computer Fraud and Abuse Act, in an amount to be determined at trial.

**COUNT IX**
*Declaratory Judgment*
(28 U.S.C. §§ 2201–2202)

77. Fetch repeats and incorporates by reference the preceding paragraphs 1 through 76 of its Counterclaims as though fully set forth herein.

78. An actual controversy exists between Fetch and Sequen concerning Fetch's rights under Section 2(d) of the MSA, which expressly permits Fetch to independently develop or support competing offerings, provided such development does not infringe Sequen's intellectual property rights, misappropriate Sequen's trade secrets, or breach Fetch's confidentiality obligations under the MSA.

79. Sequen disputes Fetch's right to continue such independent development and has sought injunctive relief that would halt Fetch's independent AI model development and bar Fetch's engineers from continuing that work.

80. Fetch is entitled to a declaration that its independent development, testing, and deployment of its own AI ranking and personalization models, including the benchmarking activities described herein, is authorized under Section 2(d) of the MSA and does not constitute a breach of the MSA or misappropriation of any trade secret or confidential information of Sequen.

A declaration of the parties' rights and obligations under Section 2(d) of the MSA is necessary and appropriate to resolve this controversy and to permit Fetch to continue its independent development efforts.

## DEMAND FOR JURY TRIAL

Fetch hereby demands a trial by jury on all issues so triable in this action.

## PRAYER FOR RELIEF

WHEREFORE, Fetch respectfully requests that the Court enter judgment in its favor and against Sequen and grant Fetch the following relief.

(a) Dismiss Sequen's Complaint in its entirety, with prejudice, and deny each and every form of relief Sequen requests therein;

(b) Award Fetch compensatory, consequential, and other damages on its Counterclaims in an amount to be determined at trial;

(c) Award Fetch restitution and disgorgement of Sequen's unjust enrichment;

(d) Enjoin Sequen, its officers, employees, and agents from further unauthorized access to Fetch's systems and confidential communications;

(e) Declare that Fetch's independent development, testing, and deployment of its own AI ranking and personalization models, including the benchmarking activities described herein, is authorized under Section 2(d) of the MSA and does not constitute a breach of the MSA or misappropriation of any trade secret or confidential information of Sequen;

(f) Award Fetch its costs and reasonable attorneys' fees incurred in this action to the extent permitted by law or contract;

(g) Award Fetch statutory pre-judgment and post-judgment interest; and

(h) Award Fetch such other and further relief as the Court deems just and proper.

Dated: August 13, 2026

OF COUNSEL:

Steven N. Feldman (*pro hac vice*)
Michael Ardeljan (*pro hac vice*)
Sarah Burack (*pro hac vice forthcoming*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
steve.feldman@lw.com
michael.ardeljan@lw.com
sarah.burack@lw.com

Carson D. Young (*pro hac vice*)
LATHAM & WATKINS LLP
811 Main Street, Suite 3700
Houston, TX 77002
(713) 546-5400
carson.young@lw.com

Marja-Liisa Overbeck (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
mari.overbeck@lw.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Adam W. Poff*
Adam W. Poff (No. 3990)
C. Barr Flinn (No. 4092)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
bflinn@ycst.com

*Attorneys for Defendant Fetch Rewards LLC*

# EXHIBIT 1

**Wade** 1:38 PM

I appreciate your thoughtful response and the opportunity to work through these points together. I think it's important to start by highlighting what we both agree on.

Fetch needs to get personalization right for our users. This is a critical unlock for both our UX and revenue potential. With our robust data set, we're uniquely positioned to deliver meaningful and valuable experiences for our users. Faber brings a strong team with deep industry expertise that we're very excited about. We recognize how Fetch could be an ideal partner for Faber to prove the impact you're confident you can deliver to the broader market.

[redacted]

I think the bigger challenge for us to address is around Fetch continuing to build internal models. This isn't a reflection on Faber but rather a core part of our strategy. Personalization is a problem we need to solve, and we can't put all our eggs in one third-party basket. That said, we are completely incentivized by what creates the most impact. That's why we're working with Faber alongside building our own. The approach will be the same across the board: deploy, measure, iterate, and repeat. The most impactful product will win.

I'm confident we can find a structure and approach that works for both sides. Let me know your thoughts, and we can keep working toward a solution.

**Zoe Weil** 5:22 PM

Wonderful! Actually reading this Im fairly confident we can resolve this pretty quickly over the phone. If you have just 10 minutes, I think we can come to an agreement pretty fast!

My number is [redacted]

# EXHIBIT 2

6:51 72

3

IS

2 People

ians fund. Investor zoe is very ...fferent from vendor zoe — though I am very stoked to get to ...e bottom of t... ! It's the only ...ay forward a... we can all WIN! 🏆 🚀 L...

Tue, Jun 2 at 11:14 PM

Zoe Weil

Ive just sent an email to both of you and your EAs requesting to speak with you. It is urgent. I cannot overstate it's importance.

What's the topic

Zoe Weil

We have a very serious issue to discuss that came to my attention in the past 24 hours. I don't want to explain over text so let's discuss tomorrow.

You should move your meeting with whatever candidate talking to. This is extremely serious.

Edited

Cant talk im about to take off on a flight.

If it's that urgent, call me when you land

Zoe Weil

I dont land until well past midnight your time.

iMessage

Zoe Weil

# EXHIBIT 3

6:51 72

...sted you so much on lan...
word .Cooley never even
...EVIEWED the... Raphael and
...put it togeth...

3

IS

2 People

Zoe Weil

[redacted]:55 PM
[redacted] - i've been traveling a bunch so may have missed this. did we have a sequen outage on 6/4?

Ethan Benjamin 1:59 PM
Not that I'm aware of. On 6/2 [redacted] Sequen had an outage for events sent, but that didn't last too long

[redacted]
[redacted] - ori from fetch was pinging me, so perhaps isolated to them?

Ethan Benjamin 2:00 PM
Yes on the [redacted] side of things no outage at all

wes, since your tiny little fucking brain doesn't seem to get it you dumb fuck, let me make it clear to you, youre a fucking thief. And I have extensive evidence of it. And im not backing the fuck down.

You fucking moron.

Seriously, what the fuck is wrong with you?

Youre a serial fucking thief with a LOT of paper trail and the ONLY reason im even taking it easy on your ass is out of deference to [redacted]. The two fucking brain cells you barely seem to have seems to continually mistake my patience with weakness — make no mistake. You will be held accountable.

Youre a provable serial liar as is yo... ...
s... ...rself with liars,
cheaters, and thieves because
that is what YOU PROVABLY

iMessage

# EXHIBIT 4

6:51 72

3

IS

2 People

wes, since your tiny little fucking brain doesn't seem to get it you dumb fuck, let me make it clear to you, youre a fucking thief. And I have extensive evidence of it. And im not backing the fuck down.

You fucking moron.

Seriously, what the fuck is wrong with you?

Youre a serial fucking thief with a LOT of paper trail and the ONLY reason im even taking it easy on your ass is out of deference to [redacted]. The two fucking brain cells you barely seem to have seems to continually mistake my patience with weakness — make no mistake. You will be held accountable.

Youre a provable serial liar as is your dumb fucking team. You surround yourself with liars, cheaters, and thieves because that is what YOU PROVABLY ARE. And I will make sure you are held accountable, you shameless piece of shit.

iMessage

# EXHIBIT 5

Patterson Belknap

www.pbwt.com

June 5, 2026

Kathryn Bi
Partner
212.336.2320
kbi@pbwt.com

***By Email and FedEx***

Cullen Brown, Esq.
Head of Legal
Fetch Rewards LLC
1050 E. Washington Ave
Madison, Wisconsin 53703
c.brown@fetch.com

**Re**: **DEMAND FOR IMMEDIATE CESSATION – Willful Theft of Trade Secrets and Breach of Contract by Fetch Rewards LLC**

Dear Mr. Brown:

Our client, Sequen AI, Inc., f/k/a Faber Labs, Inc. ("Sequen AI"), has recently become aware of egregious and calculated misconduct on the part of Fetch Rewards LLC ("Fetch") and its employees to deliberately misappropriate Sequen AI's confidential, proprietary information and trade secrets in flagrant violation of the law and the parties' contractual relationship. Fetch's knowing, willful, and unauthorized use of Sequen AI's information constitutes theft of trade secrets and requires immediate legal action absent full and complete corrective measures by Fetch as set forth in this letter.

As you are aware, Sequen AI and Fetch are parties to a Master Services Agreement, dated December 15, 2024 ("MSA"), as well as Amended and Restated Service Orders dated December 1, 2025 and April 1, 2026. Pursuant to those agreements, Sequen AI has licensed Fetch its proprietary services, including a ranking and retrieval service enabling ranking results for Fetch's individual users, customized to Fetch's environment, and for use on predefined surfaces in Fetch's application. Fetch is prohibited from using Sequen AI's services beyond the scope of the parties' agreement, and from "copy[ing], modify[ing], or creat[ing] derivative works of the Services or Documentation, in whole or in part," or "reverse engineer[ing], disassembl[ing], decompil[ing], decod[ing], adapt[ing], or otherwise attempt[ing] to derive or gain access to any software component of the Services, in whole or in part." MSA § 2(c).

Sequen AI has substantial evidence that, since at least September 2025, Fetch has knowingly and deliberately used Sequen AI's services, confidential information, intellectual property, and/or trade secrets to train and develop its own competing ranking model. This brazen misappropriation is expressly prohibited by the terms of the license and constitutes trade secret

misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., and applicable state law. Sequen AI reserves all rights and remedies, including its right to seek emergency injunctive relief, substantial monetary damages including exemplary damages and attorneys' fees, disgorgement of all profits derived from Fetch's misconduct, and referral of this matter for criminal prosecution. Sequen AI will not hesitate to pursue these remedies to the fullest extent permitted by law if the remedial actions set forth below are not taken immediately.

Sequen AI also reserves the right to pursue claims directly against Wes Schroll and any other Fetch officers, directors, employees, or agents who participated in, directed, or had knowledge of the misappropriation of Sequen AI's confidential information and trade secrets. Individuals who engage in or facilitate the theft of trade secrets may be held personally liable for damages and may face criminal prosecution. Sequen AI will not hesitate to name individual defendants in any litigation if warranted by the evidence.

Finally, for the avoidance of doubt, to the extent you fail to perform your obligations and meet the demands detailed herein, Sequen AI reserves the right to terminate the parties' agreements.

**<u>Deadline for Compliance</u>**

Fetch must confirm in writing its compliance with all remedial actions set forth below within three (3) business days of receipt of this letter. If Sequen AI does not receive satisfactory written confirmation of full compliance by that date, Sequen AI will immediately commence litigation against Fetch without further notice.

**<u>Remedial Actions</u>**

Fetch must immediately cease and desist from any and all use of Sequen AI's services, confidential information, intellectual property, and trade secrets outside the scope of the parties' agreements. Without limitation, Fetch must:

(a) Immediately halt all development, testing, and deployment of any ranking model or other technology that was developed, trained, or informed in any way by Sequen AI's services, confidential information, intellectual property, or trade secrets;
(b) Immediately sequester and cease all use of Sequen AI's confidential information, trade secrets, and any materials derived therefrom, including any Sequen AI data, rankings, services, confidential information, and/or other intellectual property and trade secrets while preserving them for litigation;
(c) Identify all Fetch employees, contractors, and agents who have accessed, used, or had exposure to Sequen AI's confidential information or trade secrets;
(d) Terminate the employment of any and all employees who impermissibly accessed and/or used Sequen AI's services beyond the scope of the license, and confirm the same in writing to Sequen AI;

(e) Provide a complete accounting of how Sequen AI's information was used, including all projects, models, products, or services that incorporated or were informed by such information; and

(f) Submit to an independent forensic audit, conducted by a mutually agreed-upon third-party forensic examiner at Fetch's sole expense, to verify compliance with the foregoing demands.

**Fetch's Preservation Obligations**

This letter constitutes formal notice that litigation is anticipated. Fetch is hereby directed to immediately implement a litigation hold and preserve all documents, communications, data, and electronically stored information (whether in Fetch's possession or in the possession of third parties, including cloud service providers) that relate in any way to the subject matter of this letter, including without limitation all communications regarding Sequen AI, the parties' agreements, Fetch's development of any ranking model or similar technology, and the conduct of any Fetch employee who had access to Sequen AI's confidential information or trade secrets. The intentional or negligent destruction, alteration, or concealment of any such materials will result in Sequen AI seeking severe sanctions, including spoliation inferences and monetary penalties, in any subsequent litigation. Fetch must confirm in writing within forty-eight (48) hours that a litigation hold has been implemented and identify all custodians and locations of potentially relevant documents and data. Please direct your written confirmation and any correspondence regarding this matter to the undersigned.

Sincerely,

Kathryn Bi

cc: Wes Schroll
Chief Executive Officer
Fetch Rewards LLC
wes@fetch.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 13, 2026, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Stephen B. Brauennan
Ronald P. Golden III
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE 19801
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

Katluyn Bi
Margaret M. O'Neil
Stephanie Sofer
PATTERSON BELKNAP WEBB
& TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
kbi@pbwt.com
moneil@pbwt.com
ssofer@pbwt.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Adam W. Poff*
Adam W. Poff (No. 3990)
C. Barr Flinn (No. 4092)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
bflinn@ycst.com

*Attorneys for Defendant Fetch Rewards LLC*